**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1339
_____

ROSA ELIDA CASTRO; A.A.G.C.;
LAURA LISSETH FLORES-PICHINTE; E.S.U.F.;
KAREN MARGARITA ZELAYA ALBERTO; S.E.A.Z;
KELLY GUTIERREZ RUBIO; G.J.S.G.;
GLADIS CARRASCO GOMEZ; B.J.R.C.;
WENDY AMPARO OSORIO MARTINEZ; D.S.R.O.;
CARMEN LEIVA-MENJIVAR; E.A.M.L.; A.M.M.L.;
DINA ISABEL HUEZO DE CHICAS; L.J.C.H.;
CINDY GISELA LOPEZ FUNEZ; W.S.M.L.;
LESLY GRIZELDA CRUZ MATAMOROS; C.N.V.C.;
JEYDI ERAZO ANDURAY; D.A.L.E.;
DINORA LEMUS; A.R.M.L.;
JENNYS MENDEZ DEBONILLA; A.B.B.M.;
MARTA ALICIA RODRIGUEZ ROMERO; W.A.M.R.;
C.A.M.R.; ROXANA AGUIRRE-LEMUS; C.A.A.;
CELIA PATRICIA SORIANO BRAN; J.A.A.S.;
MARIA DELMI MARTINEZ NOLASCO; J.E.L.M.;
GUADALUPE FLORES FLORES; W.J.B.F.;
CARMEN ALEYDA LOBO MEJIA; A.D.M.L.L.;
JULISSA CLEMENTINA HERNANDEZ JIMINEZ;
A.H.V.H.; *MARIA ERLINDA MEJIA MELGAR;

*E.N.C.M.; *D.G.C.M.;
JETHZABEL MARTIZA AGUILAR MANICA;
V.G.R.A.; HEYMI LISSAMANCIA AREVALO-
MONTERROZA; R.N.F.A;
ELSA MILAGROS RODRIGUEZ GARCIA; J.M.V.G.;
ELIZABETH BENITEZ DE MARQUEZ; A.M.B.;
INGRID MARICELA ELIAS SORIANO; A.E.C.E.;
MARIBEL MARIA ESCOBAR RAMIREZ;
C.Y.L.E.; Y.I.L.E.; R.J.L.E.;
ANA MARICEL RODRIGUEZ-GRANADOS;
J.A.B.R.; V.E.B.R.;
ZULMA LORENA PORTILLO DE DIAZ; K.L.D.P.,
Appellants

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;
UNITED STATES CUSTOMS AND BORDER
PROTECTION;
UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES;
UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT
SECRETARY OF DHS; ATTORNEY GENERAL OF
THE UNITED STATES;
COMMISSIONER OF CBP; DIRECTOR OF USCIS;
PHILADELPHIA FIELD DIRECTOR, CBP;
PHILADELPHIA ASSISTANT FIELD OFFICE

DIRECTOR, ICE; DIRECTOR, BERKS COUNTY
RESIDENTIAL CENTER


\* Dismissed Pursuant to Court's Order entered
May 13, 2016.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Nos. 5-15-cv-06153, 5-15-cv-06403,
5-15-cv-06404, 5-15-cv-06406, 5-15-cv-06410,
5-15-cv-06411, 5-15-cv-06428, 5-15-cv-06429,
5-15-cv-06430, 5-15-cv-06431, 5-15-cv-06451,
5-15-cv-06472, 5-15-cv-06474, 5-15-cv-06475,
5-15-cv-06546, 5-15-cv-06547, 5-15-cv-06551,
5-15-cv-06553, 5-15-cv-06591, 5-15-cv-06592,
5-15-cv-06594, 5-15-cv-06595, 5-15-cv-06676,
5-15-cv-06677, 5-15-cv-06755, 5-15-cv-06788,
5-15-cv-06798, 5-15-cv-06863,5-16-cv-00069

District Judge: The Honorable Paul S. Diamond
_____

Argued May 19, 2016

Before: SMITH, HARDIMAN, and SHWARTZ,
*Circuit Judges*

(Opinion Filed:  August 29, 2016)

Lee P. Gelernt                          [ARGUED]
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street
18th Floor
New York, NY  10004

Jennifer C. Newell
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA  94111

Mary Catherine Roper
Molly M. Tack-Hooper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA  19106

Witold J. Walczak
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA  15213
        *Counsel for Appellants*

Joseph A. Darrow
Erez Reuveni                           [ARGUED]
United States Department of Justice

4

Office of Immigration Litigation
450 5th Street, N.W.
Washington, DC  20001
*Counsel for Appellees*

Ethan D. Dettmer
Gibson Dunn
555 Mission Street
Suite 3000
San Francisco, CA  94105
*Counsel for Amici
Curiae Gabriel J.
Chin, Nancy
Morawetz, Hiroshi
Motomura, David
Thronson, Leti
Volpp, and
Stephen Yale-
Loehr*

Jonathan H. Feinberg
Kairys Rudovsky Messing & Feinberg
718 Arch Street
Suite 501 South
Philadelphia, PA 19106

Mark C. Fleming
WilmerHale
60 State Street

Boston, MA 02109

*Counsel for Amici Curiae Erwin Chermerinsky, Eric M. Freedman, Brandon L. Garrett, Jonathan L. Hafetz, Paul D. Halliday, Randy A. Hertz, Aziz Huq, Lee Kovarsky, Christopher N. Lasch, James S. Liebman, Gerald L. Neuman, Kermit Roosevelt, Theodore W. Ruger, Stephen I. Vladeck and Michael J. Wishnie*

Bruce P. Merenstein
Nancy Winkelman
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103

*Counsel for Amici Curiae Tahirih*

6

*Justice Center, David B. Thronson, Young Center for Immigrant Childrens Rights, Sheila I. Velez-Martinez, Shoba S. Wadhia, Maureen A. Sweeney, Harvard Immigration and Refugee Clinic, American Friends Service, Farrin R. Anello, Jon Bauer, Lenni Benson, Linda Bosniak, Benjamin Casper, Center for Gender & Refugee Studies, Denise Gilman, Joanne Gottesman, Geoffrey A. Hoffman, KIND, Inc., National Immigrant Justice Center (NIJC),*

*Sarah H. Paoletti,
Michele R.
Pistone, Galya
Ruffer and
Rebecca A.
Sharpless*

Charles Roth
National Immigrant Justice Center
208 South LaSalle Street
Suite 1300
Chicago, IL 60604
    *Counsel for
    Amicus Curiae
    National
    Immigrant Justice
    Center (NIJC)*

_____

OPINION

_____


SMITH, *Circuit Judge.*


Petitioners are twenty-eight families – twenty-eight women and their minor children – who filed habeas

petitions in the United States District Court for the Eastern District of Pennsylvania to prevent, or at least postpone, their expedited removal from this country. They were ordered expeditiously removed by the Department of Homeland Security (DHS) pursuant to its authority under § 235(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(1). Before DHS could effect their removal, however, each petitioning family indicated a fear of persecution if returned to their native country. Nevertheless, following interviews with an asylum officer and subsequent *de novo* review by an immigration judge (IJ), Petitioners' fear of persecution was found to be not credible, such that their expedited removal orders became administratively final. Each family then filed a habeas petition challenging various issues relating to their removal orders.

In this appeal we must determine, first, whether the District Court has jurisdiction to adjudicate the merits of Petitioners' habeas petitions under § 242 of the INA, 8 U.S.C. § 1252.[1] Because we hold that the District Court does not have jurisdiction under the statute, we must also

---

[1] From this point in this opinion, we will refer to provisions of the INA by their location in the United States Code.

9

determine whether the statute violates the Suspension Clause of the United States Constitution. This is a very difficult question that neither this Court nor the Supreme Court has addressed. We hold that, at least as applied to Petitioners and other similarly situated aliens, § 1252 does not violate the Suspension Clause. Consequently, we will affirm the District Court's order dismissing Petitioners' habeas petitions for lack of subject matter jurisdiction.

## I. STATUTORY FRAMEWORK

The statutory and regulatory provisions of the expedited removal regime are at the heart of this case. We will, therefore, provide an overview of the provisions which form the framework governing expedited removal before further introducing Petitioners and their specific claims. First, we will discuss 8 U.S.C. § 1225(b)(1) and its implementing regulations, which lay out the administrative side of the expedited removal regime. We will then turn to 8 U.S.C. § 1252, which specifies the scope of judicial review of all removal orders, including expedited removal orders.

### A. Section 1225(b)(1)

Under 8 U.S.C. § 1225(b)(1) and its companion regulations, two classes of aliens are subject to expedited removal if an immigration officer determines they are inadmissible due to misrepresentation or lack of immigration papers: (1) aliens "arriving in the United States," and (2) aliens "encountered within 14 days of entry without inspection and within 100 air miles of any U.S. international land border."[2]  *See* 8 U.S.C. § 1225(b)(1)(A)(i) & (iii); Designating Aliens for Expedited Removal, 69 Fed Reg. 48877-01 (Aug. 11, 2004).[3]  If an alien falls into one of these two classes, and

---

[2] Any aliens otherwise falling within these two categories but who are inadmissible for reasons other than misrepresentation or missing immigration papers are referred for regular – i.e., non-expedited – removal proceedings conducted under 8 U.S.C. § 1229a.  *See* 8 U.S.C. § 1225(b)(2)(A).

[3] The statute actually gives the Attorney General the unfettered authority to expand this second category of aliens to "any or all aliens" that cannot prove that they have been physically present in the United States for at least the two years immediately preceding the date their inadmissibility is determined, regardless of their proximity to the border.  *See* 8 U.S.C. § 1225(b)(1)(A)(iii).  Although DHS (on behalf of the Attorney General) has opted to apply the expedited removal regime only to the limited subset of aliens

11

she indicates to the immigration officer that she fears persecution or torture if returned to her country, the officer "shall refer the alien for an interview by an asylum officer" to determine if she "has a credible fear of persecution [or torture]." 8 U.S.C. § 1225(b)(1)(A)(ii) & (B)(ii); 8 C.F.R. § 208.30(d). The statute defines the term "credible fear of persecution" as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title." 8 U.S.C. § 1225(b)(1)(B)(v); *see also* 8 C.F.R. § 208.30(e)(3) ("An alien will be found to have a credible fear of torture if the alien shows that there is a significant possibility that he or she is eligible for withholding of removal or deferral of removal under the Convention Against Torture.").

Should the interviewing asylum officer determine that the alien lacks a credible fear of persecution (i.e., if the officer makes a "negative credible fear

---

described above, it has expressly reserved its authority to exercise at a later time "the full nationwide enforcement authority of [§ 1225(b)(1)(A)(iii)(II)]." *See* Designating Aliens for Expedited Removal, 69 Fed Reg. 48877-01 (Aug. 11, 2004).

12

determination"), the officer orders the removal of the alien "without further hearing or review," except by an IJ as discussed below. 8 U.S.C. § 1225(b)(1)(B)(iii)(I). The officer is then required to "prepare a written record" that must include "a summary of the material facts as stated by the applicant, such additional facts (if any) relied upon by the officer, and the officer's analysis of why, in the light of such facts, the alien has not established a credible fear of persecution." *Id.* § 1225(b)(1)(B)(iii)(II). Next, the asylum officer's supervisor reviews and approves the negative credible fear determination, after which the order of removal becomes "final." 8 C.F.R. § 235.3(b)(7); *id.* § 208.30(e)(7). Nevertheless, if the alien so requests, she is entitled to have an IJ conduct a *de novo* review of the officer's negative credible fear determination, and "to be heard and questioned by the [IJ]" as part of this review. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 1003.42(d). Assuming the IJ concurs in the asylum officer's negative credible fear determination, "[t]he [IJ]'s decision is final and may not be appealed," and the alien is referred back to the asylum officer to effect her removal. 8 C.F.R. § 1208.30(g)(2)(iv)(A).[4]

---

[4] On the other hand, if the interviewing asylum officer, or the IJ upon *de novo* review, concludes that the alien possesses a credible fear of persecution or torture, the

## B. Section 1252

Section 1252 of Title 8 defines the scope of judicial review for all orders of removal. This statute narrowly circumscribes judicial review for expedited removal orders issued pursuant to § 1225(b)(1). It provides that "no court shall have jurisdiction to review . . . the application of [§ 1225(b)(1)] to individual aliens, including the [credible fear] determination made under [§ 1225(b)(1)(B)]." 8 U.S.C. § 1252(a)(2)(A)(iii). Moreover, except as provided in § 1252(e), the statute strips courts of jurisdiction to review: (1) "any individual determination or to entertain any other cause or claim arising from or relating to the implementation or operation of an [expedited removal] order"; (2) "a decision by the Attorney General to invoke" the expedited removal regime; and (3) the "procedures and policies adopted by the Attorney General to implement the provisions of [§ 1225(b)(1)]." *Id.* § 1252(a)(2)(A)(i), (ii) & (iv). Thus, the statute makes abundantly clear that whatever jurisdiction courts have to review issues

---

alien is referred for non-expedited removal proceedings under 8 U.S.C. § 1229a, "during which time the alien may file an application for asylum and withholding of removal." 8 C.F.R. § 1208.30(g)(2)(iv)(B).

14

relating to expedited removal orders arises under § 1252(e).

Section 1252(e), for its part, preserves judicial review for only a small subset of issues relating to individual expedited removal orders:

> Judicial review of any determination made under [§ 1225(b)(1)] is available in habeas corpus proceedings, but shall be limited to determinations of—
>
> > (A) whether the petitioner is an alien,
>
> > (B) whether the petitioner was ordered removed under [§ 1225(b)(1)], and
>
> > (C) whether the petitioner can prove . . . that the petitioner is [a lawful permanent resident], has been admitted as a refugee . . . or has been granted asylum . . . .

15

*Id.* § 1252(e)(2). In reviewing a determination under subpart (B) above – i.e., in deciding "whether the petitioner was ordered removed under [§ 1225(b)(1)]" – "the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the alien is actually admissible or entitled to any relief from removal." *Id.* § 1252(e)(5).

Section 1252(e) also provides jurisdiction to the district court for the District of Columbia to review "[c]hallenges [to the] validity of the [expedited removal] system." *Id.* § 1252(e)(3)(A). Such systemic challenges include challenges to the constitutionality of any provision of the expedited removal statute or its implementing regulations, as well as challenges claiming that a given regulation is inconsistent with law. *See id.* § 1252(e)(3)(A)(i) & (ii). Nevertheless, systemic challenges must be brought within sixty days after implementation of the challenged statute or regulation. *Id.* § 1252(e)(3)(B); *see also Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 47 (D.D.C. 1998), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000) (holding that "the 60–day requirement is jurisdictional rather than a

traditional limitations period").[5]

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Petitioners are natives and citizens of El Salvador, Honduras, and Guatemala who, over a period of several months in late 2015, entered the United States seeking refuge.  While their reasons for fleeing their home countries vary somewhat, each petitioner claims to have been, or to fear becoming, the victim of violence at the hands of gangs or former domestic partners.  United States Customs and Border Protection (CBP) agents

---

[5] In its brief, as it did during oral argument, the government repeatedly argues that many of Petitioners' claims are of a systemic nature and should have been brought in the district court for the District of Colombia under § 1252(e)(3).  In making this argument, however, the government conveniently elides the fact that the sixty-day deadline would clearly prevent Petitioners from litigating their systemic claims in that forum, because that deadline passed years ago.

encountered and apprehended each petitioner within close proximity to the border and shortly after their illegal crossing. In fact, the vast majority were apprehended within an hour or less of entering the country, and at distances of less than one mile from the border; in all events, no petitioner appears to have been present in the country for more than about six hours, and none was apprehended more than four miles from the border.[6] And because none of the petitioners presented immigration papers upon their arrest, and none claimed to have been previously admitted to the country, they clearly fall within the class of aliens to whom the expedited removal statute applies. *See* Part I.A above.

After the CBP agents apprehended them and began the expedited removal process, Petitioners each expressed a fear of persecution or torture if returned to their native country. Accordingly, each was referred to

---

[6] For reasons explained in detail below, we consider the facts regarding Petitioners' entry and practically-immediate arrest by immigration enforcement officials to be crucial in resolving Petitioners' Suspension Clause argument. Accordingly, we grant the government's motion for judicial notice as well as its motion to file under seal the documents subject to its motion for judicial notice.

an asylum officer for a credible fear interview. As part of the credible fear interview process, the asylum officers filled out and gave to Petitioners a number of forms, including a form memorializing the officers' questions and Petitioners' answers during the interview. Following the interviews – all of which resulted in negative credible fear determinations – Petitioners requested and were granted *de novo* review by an IJ. Because the IJs concurred in the asylum officers' conclusions, Petitioners were referred back to DHS for removal without recourse to any further administrative review. Each petitioning family then submitted a separate habeas petition to the District Court,[7] each claiming that the asylum officer and IJ conducting their credible fear interview and review violated their Fifth Amendment procedural due process rights, as well as their rights under the INA, the Foreign

---

[7] Petitioners filed their habeas petitions in the Eastern District of Pennsylvania because they are being detained pending their removal at the Berks County Residential Center in Leesport, Pennsylvania. While we are uncertain whether venue was proper in the Eastern District of Pennsylvania – § 1252 does not appear to indicate where habeas petitions under § 1252(e)(2) should be filed – none of the parties has argued that venue was improper. In that venue is non-jurisdictional, we need not resolve the issue. *See Bonhometre v. Gonzales*, 414 F.3d 442, 446 n.5 (3d Cir. 2005).

Affairs Reform and Restructuring Act of 1998, the United Nations Convention Against Torture, the Administrative Procedure Act, and the applicable implementing regulations.[8] All the petitions were reassigned to Judge Paul S. Diamond for the limited purpose of determining whether subject matter jurisdiction exists to adjudicate Petitioners' claims.

Petitioners argued before the District Court that § 1252 is ambiguous as to whether the Court could review their challenges to the substantive and procedural soundness of DHS's negative credible fear determinations. As such, they argued that the Court

---

[8] Though Petitioners assert on appeal that they each raised "a variety" of claims in their habeas petitions, Pet'rs' Br. 33, they specifically point us to only two as being uniform across all Petitioners: first, they claim that the asylum officers conducting the credible fear interviews failed to "prepare a written record" of their negative credible fear determinations that included the officers' "analysis of why . . . the alien has not established a credible fear of persecution," 8 U.S.C. § 1225(b)(1)(B)(iii)(II); and second, they claim that the officers and the IJs applied a higher standard for evaluating the credibility of their fear of persecution than is called for in the statute.

should construe the statute to allow review of their claims in order to avoid "the serious constitutional concerns that would arise" otherwise. JA 19. The District Court roundly rejected this argument, concluding instead that § 1252 unambiguously forecloses judicial review of all of Petitioners' claims, and that to adopt Petitioners' proposed construction would require the Court "to do violence to the English language to create an 'ambiguity' that does not otherwise exist." JA 20.

Turning then to the Suspension Clause issue, the District Court separately analyzed what it termed as Petitioners' "substantive" challenges – those going to the ultimate correctness of the negative credible fear determinations – versus their challenges relating to the procedures DHS followed in making those determinations. Based on the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), the Court derived four "factors in determining the scope of an alien's Suspension Clause rights": "(1) historical precedent; (2) separation-of-powers principles; (3) the gravity of the petitioner's challenged liberty deprivation; and (4) a balancing of the petitioner's interest in more rigorous administrative and habeas procedures against the Government's interest in expedited proceedings." JA 25 (citations omitted). Applying these factors, the Court determined that the Suspension Clause did not require that judicial review be available to address any of

Petitioners' claims, and therefore that § 1252(e) does not violate the Suspension Clause. Thus, the Court dismissed with prejudice the consolidated petitions for lack of subject matter jurisdiction. Petitioners then filed a timely notice of appeal with this Court.[9]

## III. ANALYSIS

Petitioners challenge on appeal the District Court's holding that it lacked subject matter jurisdiction under § 1252(e) to review Petitioners' claims, as well as the Court's conclusion that § 1252(e) does not violate the Suspension Clause. We review *de novo* the District Court's determination that it lacked subject matter jurisdiction.[10] *Great W. Mining & Mineral Co. v. Fox*

---

[9] A motions panel of this Court granted Petitioners' motion for stay of removal pending the outcome of this appeal, as well as Petitioners' motion to expedite the appeal. The panel also granted the motions of various persons and entities for leave to file amicus briefs in support of Petitioners. The Court thanks *amici* for their valuable contributions in this appeal.

[10] Although the District Court concluded that it lacked subject matter jurisdiction and dismissed the petitions accordingly, we nonetheless have jurisdiction under 28

*Rothschild LLP*, 615 F.3d 159, 163 (3d Cir. 2010). Petitioners, as the side asserting jurisdiction, "bea[r] the burden of proving that jurisdiction exists." *Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293 (3d Cir. 2012).

## A. Statutory Jurisdiction under § 1252(e)

The government contends that § 1252 unambiguously forecloses judicial review of Petitioners' claims, and that nearly every court to address this or similar issues has held that the statute precludes challenges related to the expedited removal regime. Petitioners, on the other hand, argue that the statute can plausibly be construed to provide jurisdiction over their claims, and that, per the doctrine of constitutional avoidance, the statute should therefore be so construed. They also point to precedent purportedly supporting their position.

---

U.S.C. § 1291 "to determine [our] own jurisdiction." *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)).

We review pure legal questions of statutory interpretation *de novo*. *Ki Se Lee v. Ashcroft*, 368 F.3d 218, 221 (3d Cir. 2004). "The first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.* at 222 (internal quotation marks and citations omitted). If the statute is unambiguous, we must go no further. *Roth v. Norfalco LLC*, 651 F.3d 367, 379 (3d Cir. 2011). The statute must be enforced according to its plain meaning, even if doing so may lead to harsh results. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534, 538 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd— is to enforce it according to its terms. . . . Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding." (internal quotation marks and citations omitted)). Thus, we begin with the statute's plain meaning.

As discussed in our overview of the expedited removal regime, *see* Part I.B above, § 1252 makes abundantly clear that if jurisdiction exists to review any claim related to an expedited removal order, it exists only under subsection (e) of the statute. *See* 8 U.S.C. § 1252(a)(2)(A). And under subsection (e), unless the petitioner wishes to challenge the "validity of the

24

system" as a whole rather than as applied to her, the district courts' jurisdiction is limited to three narrow issues. *See id.* § 1252(e)(2) & (3). Petitioners in this case concede that two of those three issues do not apply to them; that is, they concede they are aliens, *id.* § 1252(e)(2)(A), and that they have not previously been lawfully admitted to the country, *id.* § 1252(e)(2)(C). Nevertheless, they argue that their claims fall within the third category of issues that courts are authorized to entertain: "whether [they have been] ordered removed under [§ 1225(b)(1).]" *Id.* § 1252(e)(2)(B).

At first glance, it is hard to see how this latter grant of jurisdiction can be of any help to Petitioners, since they do not dispute that an expedited removal order is outstanding as to each. Indeed, their argument seems even more untenable in light of § 1252(e)(5), the first sentence of which clarifies that when a court must "determin[e] whether an alien has been ordered removed under [§ 1225(b)(1)], the court's inquiry shall be limited to whether such an order in fact was issued and whether it relates to the petitioner." *Id.* § 1252(e)(5). How could the government's alleged procedural deficiencies in ordering the Petitioners' expedited removal undermine the fact that expedited removal orders "in fact w[ere] issued" and that these orders "relat[e] to the petitioner[s]"? *Id.*

25

Nevertheless, Petitioners argue that the second sentence of § 1252(e)(5) creates a strong inference that courts have jurisdiction to review claims like theirs. This sentence states, "There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal." *Id.* Petitioners argue that because this sentence explicitly prohibits review of only two narrow questions, we should read it to implicitly authorize review of other questions related to the expedited removal order, such as whether the removal order resulted from a procedurally erroneous credible fear proceeding. Furthermore, Petitioners argue that the government's proposed construction of § 1252(e)(2)(B) and (e)(5) would render the second sentence of § 1252(e)(5) superfluous since the first sentence – which would essentially limit courts' review "only [to] whether the agency literally issued the alien a piece of paper marked 'expedited removal,'" Pet'rs' Br. 15 – would already prevent review of the questions foreclosed by the second sentence. Based on these arguments, Petitioners claim that the statute is at least ambiguous as to whether their claims are reviewable and that we should construe the statute in their favor in order to avoid the "serious constitutional problems" that may ensue if we read it to foreclose habeas review. *Sandoval v. Reno*, 166 F.3d 225, 237 (3d Cir. 1999).

Petitioners are attempting to create ambiguity

26

where none exists.[11]  Their reading of the second sentence in § 1252(e)(5) may be creative, but it completely ignores other provisions in the statute – including the sentence immediately preceding it – that clearly evince Congress' intent to narrowly circumscribe judicial review of issues relating to expedited removal orders.  *See, e.g.,* 8 U.S.C. § 1252(a)(2)(A)(iii) ("[N]o court shall have jurisdiction to review . . . the application of [§ 1225(b)(1)] to individual aliens, including the [credible fear] determination made under [§ 1225(b)(1)(B)].").

As for their argument that the government's construction renders superfluous the second sentence of § 1252(e)(5), we think the better reading is that the

---

[11] And because we conclude that the statute is unambiguous, we are unable to employ the canon of constitutional avoidance to reach Petitioners' desired result.  *See Miller v. French*, 530 U.S. 327, 341 (2000) ("[T]he canon of constitutional doubt permits us to avoid [constitutional] questions only where the saving construction is not plainly contrary to the intent of Congress.  We cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question." (internal quotation marks and citations omitted)).

second sentence simply clarifies the narrowness of the inquiry under the first sentence, i.e., that "review should only be for whether an immigration officer issued that piece of paper and whether the Petitioner is the same person referred to in that order." *M.S.P.C. v. U.S. Customs & Border Prot.*, 60 F. Supp. 3d 1156, 1163-64 (D.N.M. 2014), *vacated as moot*, No. 14-769, 2015 WL 7454248 (D.N.M. Sept. 23, 2015); *see also id.* ("Rather than being superfluous . . . the second sentence seems to clarify that Congress really did mean what it said in the first sentence."); *Diaz Rodriguez v. U.S. Customs & Border Prot.*, No. 6:14-CV-2716, 2014 WL 4675182, at *2 (W.D. La. Sept. 18, 2014), *vacated as moot sub nom Diaz-Rodriguez v. Holder*, No. 14-31103, 2014 WL 10965184 (5th Cir. Dec. 16, 2014) ("The second sentence of Section 1252(e)(5) . . . is most fairly interpreted as a clarification and attempt by Congress to foreclose narrow interpretations of the first sentence of Section 1252(e)(5).").[12]

---

[12] Furthermore, even if our reading of the statute means that the second sentence is superfluous, the canon against surplusage does not always control and generally should not be followed where doing so would render ambiguous a statute whose meaning is otherwise plain. *See Lamie*, 540 U.S. at 536 (explaining that "our preference for avoiding surplusage constructions is not absolute," and

28

By reading the INA to foreclose Petitioners' claims, we join the majority of courts that have addressed the scope of judicial review under § 1252 in the expedited removal context. *See, e.g., Shunaula v. Holder*, 732 F.3d 143, 145-47 (2d Cir. 2013) (observing that § 1252 "provides for limited judicial review of expedited removal orders in habeas corpus proceedings" but otherwise deprives the courts of jurisdiction to hear claims related to the implementation or operation of a removal order, and holding that an alien's claims disputing that he sought to enter the country through fraud or misrepresentation and asserting that he was not advised that he was in an expedited removal proceeding or given the opportunity to consult with a lawyer "f[ell] within this jurisdictional bar"); *Brumme v. I.N.S.*, 275 F.3d 443, 448 (5th Cir. 2001) (characterizing argument that courts have jurisdiction under § 1252(e)(2)(B) to determine whether the expedited removal statute "was applicable in the first place" as an attempt to make "an end run around" the "clear" language of § 1252(e)(5)); *Li v. Eddy*, 259 F.3d 1132, 1134-35 (9th Cir. 2001), *opinion vacated as moot*, 324 F.3d 1109 (9th Cir. 2003) ("With respect to review of expedited removal orders, . . . the statute could not be much clearer in its intent to restrict

---

that "applying the rule against surplusage is, absent other indications, inappropriate" where applying the rule would make ambiguous an otherwise unambiguous statute).

habeas review. Accordingly, only two issues were properly before the district court: whether the order removing the petitioner was in fact issued, and whether the order named [the petitioner]." (citation omitted)); *Khan v. Holder*, 608 F.3d 325, 329-30 (7th Cir. 2010) (accord); *Diaz Rodriguez*, 2014 WL 4675182, at *2 (rejecting proposed construction similar to Petitioners' argument in this case; "The expedited removal statutes are express and unambiguous. The clarity of the language forecloses acrobatic attempts at interpretation.").

Petitioners claim that the Ninth Circuit and two district courts in other circuits have construed § 1252 to allow judicial review of claims that the aliens in question had been ordered expeditiously removed in violation of the expedited removal statute. In *Smith v. U.S. Customs and Border Protection*, 741 F.3d 1016 (9th Cir. 2014), Smith, a Canadian national, was ordered removed under § 1225(b)(1) when, upon presenting himself for inspection at the United States-Canada border, the CBP agent concluded that he was an intending immigrant without proper work-authorization documents. Smith filed a habeas petition under § 1252(e)(2)(B), claiming that Canadians are exempt from the documentation requirements for admission, which meant that the CBP agent exceeded his authority in ordering Smith removed. Therefore (Smith's argument went), he was not "ordered

30

removed under [§ 1225(b)(1)]." *Id.* at 1021. The Ninth Circuit "[a]ccept[ed] [Smith's] theory at face value" only to then reject Smith's argument on the merits. *Id.* Although the Supreme Court has disapproved of the practice, *see Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 93-94 (1998), the court appears merely to have assumed *hypothetical* jurisdiction in order to dispose of the appeal on easier merits grounds. We therefore assign no weight to either *Smith*'s outcome or its reasoning.

In *American-Arab Anti-Discrimination Commission v. Ashcroft*, 272 F. Supp. 2d 650 (E.D. Mich. 2003), several Lebanese aliens were ordered removed under § 1225(b)(1), years after entering the United States using fraudulent documentation. They filed habeas petitions challenging their expedited removal orders, and the district court concluded that it had jurisdiction "under the circumstances here . . . to determine whether the expedited removal statute was *lawfully applied* to petitioners in the first place." *Id.* at 663. To support this conclusion, the court latched onto the language in § 1252(e)(5) limiting the scope of habeas review under § 1252(e)(2)(B) to "whether [the expedited removal order] relates to the petitioner," reasoning that an order "relates to" a person only if it was lawfully applied to the person. *Id.* We find the court's construction of the statute to be not just unsupported, but

31

also flatly contradicted by the plain language of the statute itself. *See* 8 U.S.C. § 1252(a)(2)(A)(iii) ("[N]o court shall have jurisdiction to review . . . the *application* of [§ 1225(b)(1)] to individual aliens." (emphasis added)). Accordingly, we decline to follow it.

The last case Petitioners point us to is *Dugdale v. U.S. Customs and Border Protection*, 88 F. Supp. 3d 1 (D.D.C. 2015). Dugdale was an alien who had lived for extended periods in the United States but who was ordered removed pursuant to § 1225(b)(1) after trying to return to the country following a visit to Canada. He filed a habeas petition to challenge his removal order under § 1252(e)(2). In his petition he claimed, *inter alia*, that because his removal order was not signed by the supervisor of the issuing immigration officer, he was not actually "ordered removed" under § 1225(b)(1). *See id.* at 6. Addressing this argument, the court recognized that the "[c]ase law on this question is scarce." *Id.* Nevertheless, the court ultimately concluded "that a determination of whether a removal order 'in fact was issued' fairly encompasses a claim that the order was not lawfully issued due to some procedural defect." *Id.* (quoting 8 U.S.C. § 1252(e)(5)). Because the claim that the supervisor failed to sign the removal order "f[ell] within that category of claims," *id.*, the court exercised its jurisdiction, and ordered further briefing to determine if the CBP had complied with its own regulations in

issuing his removal order.

Even if we were to agree with *Dugdale* that § 1252(e)(2)(B) encompasses claims alleging "some procedural defect" in the expedited removal order, we would nonetheless find Petitioners' claims easily distinguishable. The procedural defect that Dugdale alleged was at least *arguably* related to the question whether a removal order "in fact was issued." Petitioners' claims here, on the other hand, have nothing to do with the issuance of the actual removal orders; instead, they go to the adequacy of the credible fear proceedings. Furthermore, to treat Petitioners' claims regarding the procedural shortcomings of the credible fear determination process as though they were "claim[s] that the order was not lawfully issued due to some procedural defect" would likely eviscerate the clear jurisdiction-limiting provisions of § 1252, for it would allow an alien to challenge in court practically any perceived shortcoming in the procedures prescribed by Congress or employed by the Executive – a result clearly at odds with Congress' intent.

In a final effort to dissuade us from adopting the government's proposed reading of the statute, Petitioners suggest a variety of presumably undesirable outcomes that could stem from it. For instance, they argue that under the government's reading, a court would lack

jurisdiction to review claims that, in ordering the expedited removal of an alien, "the government refused to provide a credible fear interview, manifestly applied the wrong legal standard, outright denied the applicant an interpreter, or even refused to permit the applicant to testify." Pet'rs' Br. 18; *see also* Brief for National Immigrant Justice Center as *Amicus Curiae* 5-21 (suggesting several other factual scenarios in which courts would lack jurisdiction to correct serious government violations of expedited removal statute). To this, we can only respond as the Seventh Circuit did in *Khan* when acknowledging some of the possible implications of the jurisdiction-stripping provisions of § 1252: "To say that this [expedited removal] procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior . . . is not, however, to say that courts are free to disregard jurisdictional limitations. They are not . . . ." 608 F.3d at 329.[13]

---

[13] Of course, even though our construction of § 1252 means that courts in the future will almost certainly lack statutory jurisdiction to review claims that the government has committed even more egregious violations of the expedited removal statute than those alleged by Petitioners, this does not necessarily mean that all aliens wishing to raise such claims will be without a remedy. For instance, consider the case of an alien who

34

For these reasons we agree with the District Court's conclusion that it lacked jurisdiction under § 1252 to review Petitioners' claims, and turn now to the constitutionality of the statute under the Suspension Clause.

## B. Suspension Clause Challenge

The Suspension Clause of the United States Constitution states: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

---

has been living continuously for several years in the United States before being ordered removed under § 1225(b)(1). Even though the statute would prevent him from seeking judicial review of a claim, say, that he was never granted a credible fear interview, under our analysis of the Suspension Clause below, the statute could very well be unconstitutional as applied to him (though we by no means undertake to so hold in this opinion). Suffice it to say, at least some of the arguably troubling implications of our reading of § 1252 may be tempered by the Constitution's requirement that habeas review be available in some circumstances and for some people.

U.S. Const. art. I, § 9, cl. 2. The government does not contend that we are in a time of formal suspension. Thus, the question is whether § 1252 operates as an unconstitutional suspension of the writ by stripping courts of habeas jurisdiction over all but a few narrow questions. As the party challenging the constitutionality of a presumptively constitutional statute, Petitioners bear the burden of proof. *Marshall v. Lauriault*, 372 F.3d 175, 185 (3d Cir. 2004).

Petitioners argue that the answer to the ultimate question presented on appeal – whether § 1252 violates the Suspension Clause – can be found without too much effort in the Supreme Court's Suspension Clause jurisprudence, especially in *I.N.S. v. St. Cyr*, 533 U.S. 289 (2001), and *Boumediene v. Bush*, 553 U.S. 723 (2008), as well as in a series of cases from what has been termed the "finality era." The government, on the other hand, largely views these cases as inapposite, and instead focuses our attention on what has been called the "plenary power doctrine" and on the Supreme Court cases that elucidate it. The challenge we face is to discern the manner in which these seemingly disparate, and perhaps even competing, constitutional fields interact. Ultimately, and for the reasons we will explain below, we conclude that Congress may, consonant with the Constitution, deny habeas review in federal court of claims relating to an alien's application for admission to

36

the country, at least as to aliens who have been denied initial entry or who, like Petitioners, were apprehended very near the border and, essentially, immediately after surreptitious entry into the country.

We will begin our discussion with a detailed overview of the Supreme Court's relevant Suspension Clause precedents, followed by a summary of the Court's plenary power cases. We will then explain how we think these two areas coalesce in the context of Petitioners' challenges to their expedited removal orders.

### 1. Suspension Clause Jurisprudence

The Supreme Court has held that a statute modifying the scope of habeas review is constitutional under the Suspension Clause so long as the modified scope of review – that is, the habeas substitute – "is neither inadequate nor ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977) (citing *United States v. Hayman*, 342 U.S. 205, 223 (1952)). The Court has weighed the adequacy and effectiveness of habeas substitutes on only a few occasions, and only once, in *Boumediene*, has it found a substitute wanting. *See Boumediene*, 553 U.S. at 795 (holding that "the [Detainee Treatment Act] review procedures are an inadequate substitute for habeas

corpus," and therefore striking down under the Suspension Clause § 7 of the Military Commissions Act, which stripped federal courts of habeas jurisdiction over Guantanamo Bay detainees). Thus, *Boumediene* represents our only "sum certain" when it comes to evaluating the adequacy of a given habeas substitute such as § 1252, and even then the decision "leaves open as many questions as it settles about the operation of the [Suspension] Clause." Gerald L. Neuman, *The Habeas Corpus Suspension Clause After* Boumediene v. Bush, 110 Colum. L. Rev. 537, 578 (2010).

Before we delve into *Boumediene*, however, we must examine the Supreme Court's decision in *St. Cyr*, another case on which Petitioners heavily rely. Although the Court in *St. Cyr* ultimately dodged the Suspension Clause question by construing the jurisdiction-stripping statute at issue to leave intact courts' habeas jurisdiction under 28 U.S.C. § 2241, the opinion offers insight into "what the Suspension Clause might possibly protect." Neuman, *supra*, at 539 & n.8.

St. Cyr was a lawful permanent resident alien who, in early 1996, pleaded guilty to a crime that qualified him for deportation. *St. Cyr*, 533 U.S. at 293. Under the immigration laws prevailing at the time of his conviction, he was eligible for a waiver of deportation at the Attorney General's discretion. *Id.* Nevertheless, by the

time he was ordered removed in 1997, Congress had enacted the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), 110 Stat. 3009–546. Among the myriad other revisions to our immigration laws that these enactments effected, AEDPA and IIRIRA stripped the Attorney General of his discretionary power to waive deportation, and replaced it with the authority to "cancel removal" for a narrow class of aliens that did not include aliens who, like St. Cyr, had been previously "convicted of any aggravated felony." 8 U.S.C. § 1229b(a)(3). When St. Cyr applied to the Attorney General for waiver of deportation, the Attorney General concluded that AEDPA and IIRIRA stripped him of his waiver authority even as to aliens who pleaded guilty to the deportable offense prior to the statutes' enactment. 533 U.S. at 297. St. Cyr filed a habeas petition in federal district court under § 2241, claiming that the provisions of AEDPA and IIRIRA eliminating the Attorney General's waiver authority did not apply to aliens who pleaded guilty to a deportable offense before their enactment. *Id.* at 293.

The government contended that AEDPA and IIRIRA stripped the courts of habeas jurisdiction to review the Attorney General's determination that he no longer had the power to waive St. Cyr's deportation. *Id.* at 297-98. The Court ultimately disagreed with the

government, construing the judicial review statutes to permit habeas review under § 2241. To support this construction, the Court relied heavily on the doctrine of constitutional avoidance, under which courts are "obligated to construe the statute to avoid [serious constitutional] problems" if such a saving construction is "fairly possible."[14]  *Id.* at 299-300 (internal quotation marks and citations omitted). In the Court's review, the government's proposed construction of the jurisdiction-stripping provisions would have presented "a serious Suspension Clause issue." *Id.* at 305.

To explain why the Suspension Clause could possibly have been violated by a statute stripping the courts of habeas jurisdiction under § 2241, the Court began with the foundational principle that, "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" *Id.* at 301 (quoting *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996)). Looking to the Founding era, the Court found evidence that "the writ of habeas corpus was available to nonenemy aliens as well as to citizens" as a means to challenge the "legality of Executive detention." *Id.* at 301-02. In such cases,

---

[14] The Court also relied on "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." 533 U.S. at 298.

habeas review was available to challenge "detentions based on errors of law, including the erroneous application or interpretation of statutes." *Id.* at 302.

Even while discussing the Founding-era evidence, however, the Court in *St. Cyr* was "careful not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post–1789 developments that define the present scope of the writ." *Boumediene*, 553 U.S. at 746. Indeed, the Court discussed at some length the "historical practice in immigration law," *St. Cyr*, 533 U.S. at 305, with special focus on cases from what may be termed the "finality era." *See id.* at 306-07. In order to understand the role that these finality-era cases appear to play in *St. Cyr*'s Suspension Clause analysis, and because Petitioners place significant weight on them in their argument that § 1252 violates the Suspension Clause, we will describe them in some depth.

The finality-era cases came about during an approximately sixty-year period when federal immigration law rendered final (hence, the "finality" era) the Executive's decisions to admit, exclude, or deport aliens. This period began with the passage of the

Immigration Act of 1891, ch. 551, 26 Stat. 1084,[15] and concluded when Congress enacted the Immigration and Nationality Act of 1952, Pub. L. No. 82-414, 66 Stat. 163, which permitted judicial review of deportation orders through declaratory judgment actions in federal district courts. *See Shaughnessy v. Pedreiro*, 349 U.S. 48, 51-52 (1955).[16] During this period, and despite the

---

[15] Section 8 of the Act contained the finality provision: "All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." Immigration Act of 1891, § 8, 26 Stat. 1084, 1085.

[16] Between the 1891 and 1952 Acts, Congress revised the immigration laws on several occasions, each time maintaining a similar finality provision. *See, e.g.,* Immigration Act of 1907, § 25, 34 Stat. 898, 907 ("[I]n every case where an alien is excluded from admission into the United States, under any law or treaty now existing or hereafter made, the decision of the appropriate immigration officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of Commerce and Labor."); Immigration Act of 1917, § 19, 39 Stat. 874, 890 ("In every case where any person is ordered deported from the United States

statutes' finality provisions appearing to strip courts of all jurisdiction to review the Executive's immigration-related determinations, the Supreme Court consistently recognized the ability of immigrants to challenge the legality of their exclusion or deportation through habeas corpus. Based on this, Petitioners contend that the finality-era cases "establishe[d] a constitutional floor for judicial review," Pet'rs' Br. 26, and that the Suspension Clause was the source of this floor. In making this argument, Petitioners rely especially on *Heikkila v. Barber*, 345 U.S. 229 (1953), in which the Court derived from its finality-era precedents the principle that the statutes' finality provisions "had the effect of precluding judicial intervention in deportation cases *except insofar as it was required by the Constitution*." *Id.* at 234-35 (emphasis added); *see also id.* at 234 ("During these years, the cases continued to recognize that Congress had intended to make these administrative decisions nonreviewable *to the fullest extent possible under the Constitution*." (emphasis added; citing *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens . . . is vested in the political departments of the government, and is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so

under the provisions of this Act, or of any law or treaty, the decision of the Secretary of Labor shall be final.").

established, except so far the judicial department . . . *is required by the paramount law of the constitution*, to intervene." (emphasis added)))).

Indeed, the *Heikkila* decision brings us back to *St. Cyr* and helps us understand the significance that the Court apparently assigned to the finality-era cases in its Suspension Clause discussion. First, the Court in *St. Cyr* noted that the government's proposed construction of the AEDPA and IIRIRA jurisdiction-stripping provisions "would entirely preclude review of a pure question of law by any court." 533 U.S. at 300. Such a result was problematic because, under "[the Suspension] Clause, some 'judicial intervention in deportation cases' is unquestionably 'required by the Constitution.'" *Id.* (quoting *Heikkila*, 345 U.S. at 235). In short, the Court found in the finality-era cases evidence that, as a matter of historical practice, aliens facing removal could challenge "the Executive's legal determinations,"[17]

---

[17] As support for this proposition, the Court also cited *Gegiow v. Uhl*, 239 U.S. 3 (1915). *See St. Cyr*, 533 U.S. at 306 & n.28. *Gegiow* involved Russian immigrants whom immigration officers had ordered deported after concluding that the aliens were "likely to become public charges." 239 U.S. at 8 (internal quotation marks omitted). The immigrants sought and obtained habeas review of the Executive's determination. According to

44

including "Executive interpretations of the immigration laws." *Id.* at 306-07.

We turn now to *Boumediene*. In *Boumediene* the Court addressed two main, sequential questions. First, the Court considered whether detainees at the United States Naval Station at Guantanamo Bay, Cuba, "are

---

the Supreme Court, the only reason the Executive provided to support its conclusion that the aliens were deportable was that they were not likely to find work in the city of their ultimate destination (Portland, Oregon) due to the poor conditions of the city's labor market. *Id.* at 8-9. In order to avoid the force of earlier Supreme Court precedent holding that "[t]he conclusiveness of the decisions of immigration officers under [the prevailing immigration statute's finality provision] is conclusiveness upon matters of fact," *id.* at 9 (citing *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892)), the Court presented the question on review as one of law, rather than one of fact: "whether an alien can be declared likely to become a public charge on the ground that the labor market in the city of his immediate destination is overstocked." *Id.* at 9-10. And because the Court ultimately concluded that such a consideration was not an appropriate grounds for ordering the aliens deported, it reversed the order. *Id.* at 10.

45

barred from seeking the writ or invoking the protections of the Suspension Clause either because of their status . . . as enemy combatants, or their physical location . . . at Guantanamo Bay." 553 U.S. at 739. Then, after determining that the detainees were entitled to the protections of the Suspension Clause, the Court addressed the question "whether the statute stripping jurisdiction to issue the writ avoids the Suspension Clause mandate because Congress has provided adequate substitute procedures for habeas corpus." *Id.* at 771.

In answering the first question regarding the detainees' entitlement *vel non* to the protections of the Suspension Clause, the Court primarily looked to its "extraterritoriality" jurisprudence, i.e., its cases addressing where and under what circumstances the Constitution applies outside the United States. From these precedents the Court developed a multi-factor test to determine whether the Guantanamo detainees were covered by the Suspension Clause:

> [A]t least three factors are relevant in determining the reach of the Suspension Clause: (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place;

and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

*Id.* at 766.  Based on these factors, the Court concluded that the Suspension Clause "has full effect at Guantanamo Bay."[18]  *Id.* at 771.

The Court next considered the adequacy of the habeas substitute provided to the detainees by Congress. The Detainee Treatment Act (DTA) granted jurisdiction to the Court of Appeals for the D.C. Circuit "only to assess whether the CSRT [Combat Status Review Tribunal[19]] complied with the 'standards and procedures

---

[18] While the Court obviously analyzed how these factors apply to the Guantanamo detainees in much greater depth than our brief summary might suggest, we refrain from expositing its analysis further.  That is because, as we explain in greater detail below, we think this multi-factor test provides little guidance in addressing Petitioners' entitlement to the protections of the Suspension Clause in this case.

[19] CSRTs are the military tribunals established by the Department of Defense to determine if the Guantanamo detainees are "enemy combatants" who are therefore

47

specified by the Secretary of Defense' and whether those standards and procedures are lawful." *Id.* at 777 (quoting DTA § 1005(e)(2)(C), 119 Stat. 2742). Under the DTA, the D.C. Circuit lacked jurisdiction "to inquire into the legality of the detention generally." *Id.*

In assessing the adequacy of the DTA as a habeas substitute, the Court acknowledged the lack of case law addressing "standards defining suspension of the writ or [the] circumstances under which suspension has occurred." *Id.* at 773. It also made clear that it was not "offer[ing] a comprehensive summary of the requisites for an adequate substitute for habeas corpus." *Id.* at 779. Having pronounced these caveats, the Court then began its discussion of what features the habeas substitute needed to include to avoid violating the Suspension Clause. To begin, the Court recognized what it considered to be two "easily identified attributes of any constitutionally adequate habeas corpus proceeding," *id.*: first, the Court "consider[ed] it uncontroversial [ ] that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or

subject to indefinite detention without trial pending the duration of the war in Afghanistan. *See* 553 U.S. at 733-34.

48

interpretation' of relevant law," *id.* (quoting *St. Cyr*, 533 U.S. at 302); and second, "the habeas court must have the power to order the conditional release of an individual unlawfully detained," *id.*

In addition to these two seemingly irreducible attributes of a constitutionally adequate habeas substitute, the Court identified a few others that, "depending on the circumstances, [ ] *may* be required."  *Id.* (emphasis added).  These additional features include: the ability of the prisoner to "controvert facts in the jailer's return," *see id.* at 780; "some authority to assess the sufficiency of the Government's evidence against the detainee," *id.* at 786; and the ability "to introduce exculpatory evidence that was either unknown or previously unavailable to the prisoner," *id.* at 780; *see also id.* at 786.  To determine whether the circumstances in a given case are such that the habeas substitute must also encompass these additional features, the Court discussed a number of considerations, all of which related to the "rigor of any earlier proceedings."  *Id.* at 781.  In short, the Court established a sort of sliding scale whose focus was "the sum total of procedural protections afforded to the detainee at all stages, direct and collateral."  *Id.* at 783.

Applying these principles, the Court ultimately concluded that the DTA did not provide the detainees an adequate habeas substitute.  The Court believed the DTA

could be construed to provide *most* of the attributes necessary to make it a "constitutionally adequate substitute" for habeas – including the detainees' ability to challenge the CSRT's legal and factual determinations, as well as authority for the court to order the release of the detainees if it concluded that detention was not justified. *Id.* at 787-89. Nevertheless, the DTA did not afford detainees "an opportunity . . . to present relevant exculpatory evidence that was not made part of the record in the earlier proceedings." *Id.* at 789. This latter deficiency doomed the DTA as a habeas substitute. Because of this, the Court held that the Military Commissions Act, which stripped federal courts of their § 2241 habeas jurisdiction with respect to the CSRT enemy combatant determinations, "effects an unconstitutional suspension of the writ." *Id*. at 792.

## 2. Plenary Power Jurisprudence

Against the backdrop of the Court's most relevant Suspension Clause precedents, we direct our attention to the plenary power doctrine. Because the course of this doctrine's development in the Supreme Court sheds useful light on the current state of the law, a brief historical overview is first in order.

The Supreme Court has "long recognized [that] the

power to expel or exclude aliens [i]s a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks and citation omitted). "[T]he Court's general reaffirmations of this principle have been legion." *Kleindienst v. Mandel*, 408 U.S. 753, 765-766 & n.6 (1972) (collecting cases). The doctrine first emerged in the late nineteenth century in the context of the Chinese Exclusion Act, one of the first federal statutes to regulate immigration.

The case that first recognized the political branches' plenary authority to exclude aliens, *Chae Chan Ping v. United States*, 130 U.S. 581 (1889), involved a Chinese lawful permanent resident who, prior to departing the United States for a trip abroad, had obtained a certificate entitling him to reenter the country upon his return. *Id.* at 581-82. While he was away, however, Congress passed an amendment to the Chinese Exclusion Act that rendered such certificates null and void. *Id.* at 582. Thus, after immigration authorities refused him entrance upon his return, the alien brought a habeas petition to challenge the lawfulness of his exclusion, arguing that the amendment nullifying his reentry certificate was invalid. *Id.* The Court upheld the validity of the amendment, reasoning that "[t]he power of exclusion of foreigners [is] an incident of sovereignty

51

belonging to the government of the United States as a part of those sovereign powers delegated by the constitution," and therefore that "the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained on behalf of any one." *Id.* at 609; *see also id.* (concluding that questions regarding the political soundness of the amendment "are not questions for judicial determination").

In subsequent decisions from the same period, the Court upheld and even extended its reasoning in *Chae Chan Ping*. For instance, in *Nishimura Ekiu v. United States*, 142 U.S. 651 (1892), another exclusion (as opposed to deportation) case, a Japanese immigrant was denied entry to the United States because immigration authorities determined that she was "likely to become a public charge." *Id.* at 662 (internal quotation marks and citation omitted). The Court concluded that the statute authorizing exclusion on such grounds was valid under the sovereign authority of Congress and the Executive to control immigration. *Id.* at 659 (stating that the power over admission and exclusion "belongs to the political department[s] of the government"). In a statement that perfectly encapsulates the meaning of the plenary power doctrine, the Court declared:

It is not within the province of the judiciary

52

to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law.

*Id.* at 660.[20]

---

[20] While the Court recognized Nishimura Ekiu's "entitle[ment] to a writ of *habeas corpus* to ascertain whether the restraint [of her liberty] is lawful," *id.* at 660, the scope of the Court's habeas review was limited to inquiring whether the immigration officer ordering the exclusion "was duly appointed" under the statute and whether the officer's decision to exclude her "was within the authority conferred upon him by [the Immigration

The following year, in *Fong Yue Ting v. United States*, 149 U.S. 698 (1893), the Court extended the plenary power doctrine to deportation cases as well. *Fong Yue Ting* involved several Chinese immigrants who were ordered deported pursuant to the Chinese Exclusion Act because they lacked certificates of residence and could not show by the testimony of "at least one credible white witness" that they were lawful residents. *Id.* at 702-04. The aliens sought to challenge their deportation orders, claiming, *inter alia*, that the Exclusion Act violated the equal protection clause of the Fourteenth Amendment. *See id.* at 724-25 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). As it had done in *Chae*

---

Act of 1891]." *Id.* at 664. Thus, *Nishimura Ekiu* cannot help Petitioners because, as we noted above, they have conceded that they fall within the class of aliens for whom Congress has authorized expedited removal, and that the immigration officials ordering their removal are duly appointed to do so. *See* 8 U.S.C. § 1225(b)(1)(A)(iii). That said, it would be a different matter were the Executive to attempt to expeditiously remove an alien that Congress has *not* authorized for expeditious removal – for example, an alien who claims to have been continuously present in the United States for over two years prior to her detention. Such a situation might very well implicate the Suspension Clause in a way that Petitioners' expedited removal does not.

54

*Chan Ping* and *Nishimura Ekiu*, the Court declined to intervene or review the validity of the immigration legislation:

> The question whether, and upon what conditions, these aliens shall be permitted to remain within the United States being one to be determined by the political departments of the government, the judicial department cannot properly express an opinion upon the wisdom, the policy, or the justice of the measures enacted by congress in the exercise of the powers confided to it by the constitution over this subject.

*Id.* at 731; *see also id.* at 707 ("The right of a nation to expel or deport foreigners who have not been naturalized, or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified, as the right to prohibit and prevent their entrance into the country.").

Thus, the Court's earliest plenary power decisions established a rule leaving essentially no room for judicial intervention in immigration matters, a rule that applied equally in exclusion as well as deportation cases.

Yet not long after these initial decisions, the Court began to walk back the plenary power doctrine in significant ways. In *Yamataya v. Fisher*, 189 U.S. 86 (1903), a Japanese immigrant was initially allowed to enter the country after presenting herself for inspection at a port of entry. *Id.* at 87. Nevertheless, just a few days later, an immigration officer sought her deportation because he had concluded, after some investigation, that she "was a pauper and a person likely to become a public charge." *Id.* About a week later, the Secretary of the Treasury ordered her deported without notice or hearing. *Id.* Yamataya then filed a habeas petition in federal district court to challenge her deportation, claiming that the failure to provide her notice and a hearing violated due process. *Id.* The Court acknowledged its plenary power precedents, including *Nishimura Ekiu* and *Fong Yue Ting*, *see id.* at 97-99, but clarified that these precedents did not recognize the authority of immigration officials to "disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution." *Id.* at 100. According to these "fundamental principles," the Court held, no immigration official has the power

> arbitrarily to cause an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally

56

here, to be taken into custody and deported
without giving him all opportunity to be
heard upon the questions involving his right
to be and remain in the United States.

*Id.* at 101.[21]

Thus, *Yamataya* proved to be a "turning point" in
the Court's plenary power jurisprudence. Henry M. Hart,
Jr., *The Power of Congress to Limit the Jurisdiction of
Federal Courts: An Exercise in Dialectic*, 66 Harv. L.
Rev. 1362, 1390 n.85 (1953). Indeed, as Professor Hart
explains, it was at this point that the Court "began to see
that the premise [of the plenary power doctrine] needed
to be qualified – that a power to lay down general rules,
even if it were plenary, did not necessarily include a

---

[21] Although the Court recognized the due process rights
of recent entrants to the country – even entrants who are
subsequently determined "to be illegally here" – it
explicitly declined to address whether very recent
*clandestine* entrants like Petitioners enjoy such rights.
*See Yamataya*, 189 U.S. at 100. For obvious reasons, and
as we explain below, we consider this carve-out in the
Court's holding to be of particular importance in
resolving this appeal.

power to be arbitrary or to authorize administrative officials to be arbitrary." *Id.* at 1390; *see also* Charles D. Weisselberg, *The Exclusion and Detention of Aliens: Lessons from the Lives of Ellen Knauff and Ignatz Mezei*, 143 U. Pa. L. Rev. 933, 947-48 & n.62 (1995) (discussing *Yamataya*'s significance to the development of the plenary power doctrine). *Yamataya*, then, essentially gave way to the finality-era cases upon which Petitioners and *amici* place such considerable weight. Hart, *supra*, at 1391 & n.86 (noting the "[t]housands" of habeas cases challenging exclusion and deportation orders "whose presence in the courts cannot be explained on any other basis" than on the reasoning of *Yamataya*).

Nevertheless, *Yamataya* did not mark the only "turning point" in the development of the plenary power doctrine. Nearly fifty years after *Yamataya*, the Court issued two opinions – *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) – that essentially undid the effects of *Yamataya*, at least for aliens "on the threshold of initial entry," as well as for those "assimilated to that status for constitutional purposes." *Mezei*, 345 U.S. at 212, 214 (internal quotation marks and alterations omitted); *see also* Hart, *supra*, at 1391-92 (explaining the significance of *Knauff* and *Mezei* for the Court's plenary power jurisprudence, noting specifically that by these decisions the Court

58

"either ignores or renders obsolete every habeas corpus case in the books involving an exclusion proceeding").

In *Knauff*, the German wife of a United States citizen sought admission to the country pursuant to the War Brides Act. 338 U.S. at 539 (citing Act of Dec. 28, 1945, ch. 591, 59 Stat. 659 (1946)). She was detained immediately upon her arrival at Ellis Island, and the Attorney General eventually ordered her excluded, without a hearing, because "her admission would be prejudicial to the interests of the United States." *Id.* at 539-40. The Court upheld the Attorney General's decision largely on the basis of pre-*Yamataya* plenary power principles and precedents:

> [T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. The action of the executive officer under such authority is final and conclusive. Whatever the rule may be concerning deportation of persons who have gained entry into the United States, it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the

59

> Government to exclude a given alien. . . .
> Whatever the procedure authorized by
> Congress is, it is due process as far as an
> alien denied entry is concerned.

*Id.* at 543-44 (citing, *inter alia*, *Nishimura Ekiu*, 142 U.S. at 659-60 and *Fong Yue Ting*, 149 U.S. at 713-14). Thus, with its holding in *Knauff*, the Court effectively "reinvigorated the judicial deference prong of the plenary power doctrine." Weisselberg, *supra*, at 956.

Similar to *Knauff*, *Mezei* involved an alien detained on Ellis Island who was denied entry for undisclosed national security reasons. Unlike Knauff, however, Mezei had previously lived in the United States for many years before leaving the country for a period of approximately nineteen months, "apparently to visit his dying mother in Rumania [*sic*]." 345 U.S. at 208. And unlike Knauff, Mezei had no choice but to remain in custody indefinitely on Ellis Island, as no other country would admit him either. *Id.* at 208-09. In these conditions, Mezei brought a habeas petition to challenge his exclusion (and attendant indefinite detention). *Id.* at 209. Nevertheless, the Court again upheld the Executive's decision, essentially for the same reasons articulated in *Knauff*. "It is true," the Court explained, "that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings

60

conforming to traditional standards of fairness encompassed in due process of law." *Id.* at 212 (citing, *inter alia*, *Yamataya*, 189 U.S. at 100-01). In contrast, aliens "on the threshold of initial entry stan[d] on different footing: 'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'"[22] *Id.* (quoting *Knauff*, 338 U.S. at 544).

Thus, *Knauff* and *Mezei* essentially restored the political branches' plenary power over aliens at the border seeking initial admission. And since these decisions, the Court has continued to signal its commitment to the full breadth of the plenary power

---

[22] Although Mezei (like Knauff) was indisputably on United States soil when he was ordered excluded and when he filed his habeas petition, the Court "assimilated" Mezei's status "for constitutional purposes" to that of an alien stopped at the border. *See id.* at 214 (internal quotation marks and citation omitted). This analytical maneuver is often referred to as the "entry fiction" or the "entry doctrine." *See, e.g., Jean v. Nelson*, 727 F.2d 957, 969 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985). As explained below, the entry fiction plays an important, albeit indirect, role in our analysis of Petitioners' Suspension Clause challenge.

doctrine, at least as to aliens at the border seeking initial admission to the country.[23] *See Fiallo*, 430 U.S. at 792 ("This Court has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens. Our cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute

---

[23] The Court has departed from its reasoning in *Knauff* and *Mezei* in other respects, including for lawful permanent residents seeking reentry at the border, *see Landon v. Plasencia*, 459 U.S. 21, 32-33 (1982) (holding that such aliens are entitled to protections of Due Process Clause in exclusion proceedings), as well as for resident aliens facing indefinite detention incident to an order of deportation following conviction of a deportable offense, *compare Zadvydas v. Davis*, 533 U.S. 678, 692-95 (2001) (concluding that resident aliens ordered deported have liberty interest under Fifth Amendment in avoiding indefinite detention incident to deportation, and distinguishing *Mezei* on grounds that petitioners had already entered U.S. before ordered deported), *with id.* at 702-05 (Scalia, J., dissenting) (arguing that *Mezei* controlled question whether aliens ordered deported had liberty interest to remain in United States such that they are entitled to due process in decision to hold them indefinitely, and stating that such aliens have no right to release into the United States).

exercised by the Government's political departments largely immune from judicial control." (internal quotation marks and citations omitted)); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." (citing *Knauff*, 338 U.S. at 542; *Nishimura Ekiu*, 142 U.S. at 659-60)).

### 3. Application to Petitioners and the Expedited Removal Regime

Having introduced the prevailing understandings of the Suspension Clause and of the political branches' plenary power over immigration, we now consider the relationship between these two areas of legal doctrine and how they apply to Petitioners' claim that the jurisdiction-stripping provisions of § 1252 violate the Suspension Clause.

Petitioners argue that under the Supreme Court's Suspension Clause jurisprudence – especially *St. Cyr* and the finality-era cases – courts must, at a minimum, be able to review the legal conclusions underlying the Executive's negative credible fear determinations, including the Executive's interpretation and application

of a statute to undisputed facts.[24] And because § 1252(e)(2) does not provide for at least this level of review, Petitioners claim that it constitutes an inadequate substitute for habeas, in violation of the Suspension Clause.

---

[24] Petitioners at times claim that they should also be entitled to raise *factual* challenges due to the "truncated" nature of the credible fear determination process. Notwithstanding *Boumediene*'s holding that habeas review of factual findings may be required in some circumstances, we think Petitioners' argument is readily disposed of based solely on some of the very cases they cite to argue that § 1252 violates the Suspension Clause. *See, e.g., St. Cyr*, 533 U.S. at 306 (noting that in finality-era habeas challenges to deportation orders "the courts generally did not review factual determinations made by the Executive"); *Heikkila*, 345 U.S. at 236 (noting that "the scope of inquiry on habeas corpus" "has always been limited to the enforcement of due process requirements," and not to reviewing the record to determine "whether there is substantial evidence to support administrative findings of fact"); *Gegiow*, 239 U.S. at 9 ("The conclusiveness of the decisions of immigration officers under [the finality provision of the Immigration Act of 1907] is conclusiveness upon matters of fact.").

The government, on the other hand, claims that the plenary power doctrine operates to foreclose Petitioners' Suspension Clause challenge. In the government's view, Petitioners should be treated no differently from aliens "on the threshold of initial entry" who clearly lack constitutional due process protections concerning their application for admission. *Mezei*, 345 U.S. at 212. And because Petitioners "have no underlying procedural due process rights to vindicate in habeas," Respondents' Br. 49, the government argues that "the scope of habeas review is [ ] irrelevant." *Id.*

Petitioners raise three principal arguments in response to the government's contentions above. First, they claim that to deny them due process rights despite their having indisputably entered the country prior to being apprehended would run contrary to numerous Supreme Court precedents recognizing the constitutional rights of all "persons" within the territorial jurisdiction of the United States. *See, e.g., Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (explaining that the Fifth Amendment applies to all aliens "within the jurisdiction of the United States," including those "whose presence in this country is unlawful, involuntary, or transitory"). Second, they argue that even if the Constitution does not impose any independent procedural minimums that the Executive must satisfy before removing Petitioners, the Executive must at least fairly administer those procedures that

65

Congress has actually prescribed in the expedited removal statute. *Cf. Dia v. Ashcroft*, 353 F.3d 228, 238-39 (3d Cir. 2003) (en banc) (holding that Fifth Amendment entitles aliens to due process in deportation proceedings, and explaining that these rights "ste[m] from those statutory rights granted by Congress and the principle that '[m]inimum due process rights attach to statutory rights.'" (quoting *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996))). Third, Petitioners claim that, regardless of the extent of their constitutional or statutory due process rights, habeas corpus stands as a constitutional check against illegal detention by the Executive that is separate and apart from the protections afforded by the Due Process Clause.

We agree with the government that Petitioners' Suspension Clause challenge to § 1252 must fail, though we do so for reasons that are somewhat different than those urged by the government. As explained in Part III.B.1 above, *Boumediene* contemplates a two-step inquiry whereby courts must first determine whether a given habeas petitioner is prohibited from invoking the Suspension Clause due to some attribute of the petitioner or to the circumstances surrounding his arrest or detention. *Cf. Boumediene*, 553 U.S. at 739. Only after confirming that the petitioner is not so prohibited may courts then turn to the question whether the substitute for habeas is adequate and effective to test the legality of the

66

petitioner's detention (or removal). As we explain below, we conclude that Petitioners cannot clear *Boumediene*'s first hurdle – that of proving their entitlement *vel non* to the protections of the Suspension Clause.[25]

The reason Petitioners' Suspension Clause claim falls at step one is because the Supreme Court has unequivocally concluded that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon*, 459 U.S. at 32. Petitioners were each apprehended within hours of surreptitiously entering the United States, so we think it appropriate to treat them as

---

[25] In evaluating Petitioners' rights under the Suspension Clause, we find *Boumediene*'s multi-factor test, referenced earlier in this opinion, to provide little guidance. As we explain above, the Court derived the factors from its extraterritoriality jurisprudence in order to assess the reach of the Suspension Clause to a territory where the United States is not sovereign. *See* 553 U.S. at 766. In our case, of course, there is no question that Petitioners were apprehended within the sovereign territory of the United States; thus, the *Boumediene* factors are of limited utility in determining Petitioners' entitlement to the protections of the Suspension Clause.

67

"alien[s] seeking initial admission to the United States." *Id.* And since the issues that Petitioners seek to challenge all stem from the Executive's decision to remove them from the country, they cannot invoke the Constitution, including the Suspension Clause, in an effort to force judicial review beyond what Congress has already granted them. As such, we need not reach the second question under the *Boumediene* framework, i.e., whether the limited scope of review of expedited removal orders under § 1252 is an adequate substitute for traditional habeas review.[26]

Petitioners claim that *St. Cyr* and the finality-era cases firmly establish their right to invoke the Suspension Clause to challenge their removal orders.[27] For two main

[26] And because we hold that Petitioners cannot even invoke the Suspension Clause to challenge issues related to their admission or removal from the country, we have no occasion to consider what constitutional or statutory due process rights, if any, Petitioners may have.

[27] Petitioners also rely on this Court's decision in *Sandoval v. Reno*, 166 F.3d 225 (3d Cir. 1999), which is factually and analytically very similar to *St. Cyr*. Because *St. Cyr* essentially subsumes *Sandoval*, however, our reasons for rejecting *St. Cyr*'s significance in our case apply equally to *Sandoval*.

reasons we think Petitioners' reliance on these cases is flawed. First, *St. Cyr* involved a lawful permanent resident, a category of aliens (unlike recent clandestine entrants) whose entitlement to broad constitutional protections is undisputed. *Cf. Landon*, 459 U.S. at 32. Second, as stated earlier, *St. Cyr* discussed the Suspension Clause (and therefore the finality-era cases) only to explain what the Clause "might possibly protect," Neuman, *supra*, at 539 & n.8, not what the Clause most certainly protects – and even in this hypothetical posture the opinion was non-committal when discussing the significance of the finality-era cases to the Suspension Clause analysis. *See* 533 U.S. at 304 ("St. Cyr's constitutional position finds *some* support in our prior immigration cases . . . . [T]he ambiguities in the scope of the exercise of the writ at common law . . . , and the *suggestions* in this Court's prior decisions as to the extent to which habeas review could be limited consistent with the Constitution, convince us that the Suspension Clause questions that would be presented by the INS' reading of the immigration statutes before us are difficult and significant." (emphases added; citing *Heikkila*, 345 U.S. at 234-35)). Indeed, the Court had good reason to tread carefully when it came to the meaning of the finality-era cases; after all, none of them even mentions the Suspension Clause, let alone identifies it as the

69

constitutional provision establishing the minimum measure of judicial review required in removal cases.[28]

---

[28] It was largely for this reason that the District Court below declined to assign much weight to the finality-era cases in its analysis of Petitioners' Suspension Clause argument. Petitioners and *amici* contend that the Suspension Clause was the only "logical" constitutional provision that the Court in *Heikkila* could have relied upon when explaining that "the Constitution" required a certain level of judicial review of immigration decisions. *See* Brief for Scholars of Habeas Corpus Law, Federal Courts, and Constitutional Law as *Amicus Curiae* 12. Given the tentative and hypothetical nature of the Court's Suspension Clause analysis in *St. Cyr*, we too are hesitant to extract too much Suspension Clause-related guidance from a series of cases whose precise relationship (if any) to the Suspension Clause is far from clear. This is especially so in light of Justice Scalia's dissent in *St. Cyr* in which he forcefully critiqued the majority's reliance on the finality-era cases generally and *Heikkila* specifically:

> The Court cites many cases which it says establish that it is a "serious and difficult constitutional issue" whether the Suspension Clause prohibits the elimination of habeas jurisdiction effected by IIRIRA. Every one of those cases, however, pertains not to the

70

meaning of the Suspension Clause, but to the content of the habeas corpus provision of the United States Code, which is quite a different matter. The closest the Court can come is a statement in one of those cases to the effect that the Immigration Act of 1917 "had the effect of precluding judicial intervention in deportation cases except insofar as it was required by the Constitution," *Heikkila*, 345 U.S., at 234-35. That statement (1) was pure dictum, since the Court went on to hold that the judicial review of petitioner's deportation order was unavailable; (2) does not specify to what extent judicial review was "required by the Constitution," which could (as far as the Court's holding was concerned) be zero; and, most important of all, (3) does not refer to the Suspension Clause, so could well have had in mind the due process limitations upon the procedures for determining deportability that our later cases establish.

533 U.S. at 339 (Scalia, J., dissenting) (some citations omitted).

Nevertheless, we need not resolve this issue in our case, for even if *St. Cyr* definitively established the import of

71

We therefore conclude that *St. Cyr* and the finality-era cases are not controlling here.

Another potential criticism of our position – and particularly of our decision to treat Petitioners as "alien[s] seeking initial admission to the United States" who are prohibited from invoking the Suspension Clause – is that it appears to ignore the Supreme Court's precedents suggesting that an alien's physical presence in the country alone flips the switch on constitutional protections that are otherwise dormant as to aliens outside our borders. *See Mathews*, 426 U.S. at 77 ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to th[e] constitutional protection [of the Due Process Clause]."); *Zadvydas*, 533 U.S. at 693 ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful,

the finality-era cases to the Suspension Clause, we still think the distinction between a lawful permanent resident and a very recent surreptitious entrant makes all the difference in this case. More on this below.

72

unlawful, temporary, or permanent." (citations omitted)); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886); *Yamataya*, 189 U.S. at 100-01; *Mezei*, 345 U.S. at 212; *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958); *Plyler v. Doe*, 457 U.S. 202, 210 (1982). Again, this criticism is misplaced for two principal reasons.

First, and perhaps most fundamentally, most of the cases cited above did not involve aliens who were seeking initial entry to the country or who were apprehended immediately after entry. *See, e.g., Yick Wo*, 118 U.S. at 358 (long-time resident alien); *Mathews*, 426 U.S. at 69 (lawfully admitted resident aliens); *Plyler*, 457 U.S. at 206 (undocumented resident aliens); *Zadvydas*, 533 U.S. at 684-85 (long-time resident aliens). And as for the cases that *did* involve arriving aliens, the Court rejected the aliens' efforts to invoke additional protections based merely on their presence in the territorial jurisdiction of the United States.[29] *See Mezei*,

---

[29] Petitioners make much of the fact that the Court extended constitutional due process protections to the alien in *Yamataya* despite her short stint in the United States. *See* 189 U.S. at 87, 100-01. Petitioners' reliance on this case ignores other language in the opinion clearly distinguishing Yamataya – an alien who was initially admitted to the country and who "ha[d] become . . . a part of its population" before being ordered deported, *id.* at

73

345 U.S. at 207 (former resident alien held on Ellis Island seeking readmission after extended absence); *Leng May Ma*, 357 U.S. at 186 (arriving alien allowed into the country on parole pending admission determination). Thus, Petitioners can draw little support from these latter cases.

Second, the Supreme Court has suggested in several other opinions that recent clandestine entrants like Petitioners do not qualify for constitutional protections based merely on their physical presence alone. *See Yamataya*, 189 U.S. at 100-01 (withholding judgment on question "whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for too brief a period to have become, in any real sense, a part of our population, before his right to remain is disputed"); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 (1950) ("It was under compulsion of the Constitution that this Court long ago held [in *Yamataya*]

101 – from very recent clandestine entrants like Petitioners, *see id.* at 100. Thus, while *Yamataya* might apply in some future case where the alien ordered removed has been in the country for a period of time sufficient "to have become, in [some] real sense, a part of our population," *id.*, that simply is not this case.

74

that an antecedent deportation statute must provide a hearing *at least for aliens who had not entered clandestinely and who had been here some time even if illegally.*" (emphasis added)); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien *lawfully enters and resides in this country* he becomes invested with the rights guaranteed by the Constitution to all people within our borders." (emphasis added)); *Landon*, 459 U.S. at 32 (1982) ("[O]nce an alien gains admission to our country *and begins to develop the ties that go with permanent residence* his constitutional status changes accordingly." (emphasis added)); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (stating in dicta that "aliens receive constitutional protections when they have come within the territory of the United States *and developed substantial connections with this country*" (emphasis added)). At a minimum, we conclude that all of these cases call into serious question the proposition that even the slightest entrance into this country triggers constitutional protections that are otherwise unavailable to the alien outside its borders. Such a proposition is further weakened by the Court's adoption of the "entry fiction" to deny due process rights to aliens even though they are unquestionably within the territorial jurisdiction of the United States. In other words, if entitlement to constitutional protections turned entirely on an alien's position relative to such a rigid

75

conception as a line on a map, then the Court's entry-fiction cases such as *Mezei* would run just as contrary to this principle as our holding in this case does.[30]

We thus conclude that, as recent surreptitious entrants deemed to be "alien[s] seeking initial admission to the United States," Petitioners are unable to invoke the Suspension Clause, despite their having effected a brief entrance into the country prior to being apprehended for removal.[31]

---

[30] This is not to say that an alien's location relative to the border is *irrelevant* to a determination of his rights under the Constitution. Indeed, we think physical presence is a factor courts should consider; we simply leave it to courts in the future to evaluate the Suspension Clause rights of an alien whose presence in the United States goes meaningfully beyond that of Petitioners here.

[31] In addition to the above, it is worth noting that when the Court in *Landon* stated that certain aliens lack constitutional rights regarding their application for admission, it did not categorize aliens based on whether they have *entered* the country or not; rather, the Court focused (as IIRIRA and the expedited removal regime focus) on whether the aliens are "seeking initial

*admission* to the United States." *Landon*, 459 U.S. at 32 (emphasis added); *see also, e.g.,* 8 U.S.C. § 1225(b)(1) (conditioning aliens' eligibility for expedited removal, in part, on inadmissibility, even if aliens are physically present in the United States). Arguably, this suggests that, at least in some circumstances, an alien's mere physical presence in the country is of little constitutional significance unless that alien has previously applied for and been granted admission. *See* David A. Martin, *Two Cheers for Expedited Removal in the New Immigration Laws*, 40 Va. J. Int'l L. 673, 689 n.55 (2000) (arguing that "by emphasizing admission over entry, [*Landon*] may give more weight to" the constitutional significance of IIRIRA's focus on aliens' admissibility rather than physical location). Then again, *Landon* relied on *Knauff* to support its statement that "an alien seeking initial admission . . . has no constitutional rights regarding his application." *See Landon*, 459 U.S. at 32 (citing, *inter alia*, *Knauff*, 338 U.S. at 542). And since *Knauff* focused on whether the alien had "entered" the country, "initial admission" in *Landon* may simply be synonymous with "initial entry." At all events, our opinion should not be read to place tremendous weight on this possible distinction.

Our holding rejecting Petitioners' Suspension Clause claims is true to the arc traced by the Supreme Court's plenary power cases in recent decades. It is also consistent with the Court's analytical framework for evaluating Suspension Clause challenges. Even if Petitioners would be entitled to constitutional habeas under the finality-era cases, those cases, as explained above, no longer represent the prevailing view of the plenary power doctrine, at least when it comes to aliens seeking initial admission. Instead, we must look to *Knauff*, *Mezei*, and other cases reaffirming those sea-changing precedents, all of which point to the conclusion that aliens seeking initial admission to the country – as well as those rightfully assimilated to that status on account of their very recent surreptitious entry – are prohibited from invoking the protections of the Suspension Clause in order to challenge issues relating to their application for admission.[32]

---

[32] Of course, as we recognized above, this is not to say that the political branches' power over immigration is limitless in all respects. We doubt, for example, that Congress could authorize, or that the Executive could engage in, the indefinite, hearingless detention of an alien simply because the alien was apprehended shortly after clandestine entrance. *Cf. Zadvydas*, 533 U.S. at 695 (noting that the question before the Court – "whether

aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States" – does not implicate questions regarding "the political branches' authority to control entry into the United States"). And we are certain that this "plenary power" does not mean Congress or the Executive can subject recent clandestine entrants or other arriving aliens to inhumane treatment. *Cf. Wong Wing v. United States*, 163 U.S. 228, 237 (1896) (noting that "[n]o limits can be put by the courts upon the power of congress to protect, by summary methods, the country from the advent of aliens whose race or habits render them undesirable as citizens, or to expel such if they have already found their way into our land, and unlawfully remain therein," but distinguishing such valid exercises of power from a law allowing the Executive to subject deportable aliens to hard labor without a jury trial); *Zadvydas*, 533 U.S. at 704 (Scalia, J., dissenting) (noting the difference between the rights of aliens not to be tortured or "subjected to the punishment of hard labor without a judicial trial" and the right to remain in the country after being deemed deportable); *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987) ("The 'entry fiction' that excludable aliens are to be treated as if detained at the border despite their physical presence in the United States determines the aliens' rights with regard to immigration and deportation

## IV. CONCLUSION

We are sympathetic to the plight of Petitioners and other aliens who have come to this country seeking protection and repose from dangers that they sincerely believe their own governments are unable or unwilling to address. Nevertheless, Congress has unambiguously limited the scope of judicial review, and in so doing has foreclosed review of Petitioners' claims. And in light of the undisputed facts surrounding Petitioners' surreptitious entry into this country, and considering Congress' and the Executive's plenary power over decisions regarding the admission or exclusion of aliens, we cannot say that this limited scope of review is unconstitutional under the Suspension Clause, at least as to Petitioners and other aliens similarly situated. We will therefore affirm the District Court's order dismissing Petitioners' habeas petitions for lack of subject matter jurisdiction.

---

proceedings. It does not limit the right of excludable aliens detained within United States territory to humane treatment." (footnote omitted)). But to say that the political branches' power over immigration is subject to important limits in some contexts by no means requires that the exercise of that power must be subject to judicial review in all contexts.

*Rosa Elida Castro et al. v. U.S. Department of Homeland Security*, No. 16-1339

HARDIMAN, *Circuit Judge*, concurring *dubitante*.

I join Judge Smith's excellent opinion in full, but I write separately to express my doubt that the expression of the plenary power doctrine in *Landon v. Plasencia* completely resolves step one of the Suspension Clause analysis under *Boumediene*. Although *Landon* appears to preclude "alien[s] seeking initial admission to the United States" from invoking any constitutional protections "regarding [their] application[s]," the question of what constitutional rights such aliens are afforded was not squarely before the Supreme Court in that case because the petitioner was a returning permanent resident. 459 U.S. 21, 23, 32 (1982). Nor did the Court in *Landon* purport to resolve a jurisdictional question raising the possibility of an unconstitutional suspension of the writ of habeas corpus.[1]

---

[1] *Landon* may also be at odds with the proposition that "the Suspension Clause protects the writ 'as it existed in 1789.'" *INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (quoting *Felker v. Turpin*, 518 U.S. 651, 663–64 (1996)); *see also Boumediene v. Bush*, 553 U.S. 723, 746 (2008). *See generally* Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Context, and American Implications*, 94 Va. L. Rev. 575, 675–76 (2008) ("A sample of newspapers from the 1780s provides four instances of the use of the writ by slaves in

Despite my uncertainty about *Landon*'s dispositive application here, I am convinced that we would reach the same result under step two of *Boumediene*'s framework. Unlike the petitioners in *Boumediene*—who sought their release in the face of indefinite detention—Petitioners here seek to alter their status in the United States in the hope of *avoiding* release to their homelands. That prayer for relief, in my view, dooms the merits of their Suspension Clause argument that 8 U.S.C. § 1252(e) provides an "inadequate or ineffective" habeas substitute. *United States v. Hayman*, 342 U.S. 205, 223 (1952).

---

Connecticut, New Jersey, Pennsylvania, and Maryland. These suggest that the use of the writ was not confined to native-born British-American citizens of European ancestry, and that American usage was paralleling that in England and its colonies. Indeed, it is difficult to imagine that Americans were not aware of reports of the decision in Somerset's Case of 1772, in which Chief Justice Mansfield ruled that a slave in England could not be held in custody.").