**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1963
_____

MIGUEL ANGEL ROBLES CORCUERA,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of a
Decision of the Board of Immigration Appeals
(Agency Case No. A244-034-054)
Immigration Judge: Tamar H. Wilson
_____

Argued on March 4, 2025

Before: MATEY, FREEMAN, and ROTH, *Circuit Judges*

(Opinion filed: October 15, 2025)

Pina Cirillo  [Argued]
Rutgers University of Law
Immigrant Rights Clinic
123 Washington Street
4th Floor
Newark, NJ 07102
        *Counsel for Petitioner*

Lynda Do  [Argued]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

     *Counsel for Respondent*

_____

OPINION[*]

_____

FREEMAN, *Circuit Judge*.

Miguel Angel Robles Corcuera petitions for review of a Board of Immigration Appeals (BIA) order dismissing his appeal of an Immigration Judge's (IJ) order. For the reasons that follow, we will grant the petition, vacate the BIA's order, and remand to the BIA with instructions to remand to the IJ for a new hearing.

**I**

Robles is a citizen of Mexico. In April 2023, he entered the United States without authorization. The Department of Homeland Security (DHS) charged him with inadmissibility for seeking admission without a valid entry document, but it paroled him into the country. *See* 8 U.S.C. § 1182(a)(7)(A)(i). Two weeks later, DHS notified Robles that he would have a master calendar hearing before an IJ in July 2026.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

In September 2023, New Jersey authorities arrested Robles on charges of aggravated assault and possession of a weapon. Soon thereafter, immigration officials took Robles into custody and detained him in rural Pennsylvania. In November 2023, DHS notified him that he would have a master calendar hearing for his immigration case on December 1, 2023. The written notice informed Robles in English of his right to be represented by counsel in the immigration proceedings and provided a list of free or low-cost legal-service providers.

Robles appeared without counsel at the December 1 hearing, and the IJ granted Robles a two-week continuance to allow him to seek counsel. On December 15, 2023, Robles again appeared before the IJ without counsel. He reported that one attorney had responded to his outreach efforts, telling him to request a week to twenty days of additional time so she could try to find him an attorney. The IJ continued the master calendar hearing "one more time," scheduling it for January 12, 2024. A.R. 102.

On January 12, Robles again appeared before the IJ without counsel. He explained that he had tried to seek counsel but had received no response until the day before, when an attorney told him she would look into his case and he should ask for another continuance. Without responding to that request for a continuance, the IJ proceeded to the merits of the removal proceedings. After questioning Robles briefly, the IJ issued an oral decision: that Robles "ma[de] a knowing, voluntary, intelligent decision to waive his right to counsel," A.R. 88; is inadmissible; and does not appear eligible for asylum or other relief from removal. Accordingly, the IJ ordered Robles removed to Mexico.

3

Within a month, Robles secured counsel and timely appealed to the BIA. Through counsel, he moved for a remand to the IJ so he could seek asylum, withholding of removal, and relief under the Convention Against Torture. Among other things, he argued that the IJ had violated his due process rights by denying his last request for a continuance to seek counsel.

The BIA dismissed Robles's appeal and declined to remand the case to the IJ. It concluded that no additional continuance was warranted because the IJ had informed Robles of his right to counsel and given him a reasonable opportunity to obtain counsel.[1]

This timely petition for review followed.

---

[1] The BIA also rejected Robles's argument that the IJ violated his due process rights by not informing him of his right to apply for asylum and withholding of removal, including voluntary departure. Although Robles raises this issue in his petition for review, we need not address it in light of our disposition.

**II**[2]

"The Due Process Clause of the Fifth Amendment guarantees noncitizens the right to effective assistance of counsel in removal proceedings[.]"[3] *Freza v. Att'y Gen.*, 49 F.4th 293, 298 (3d Cir. 2022). Statutes and regulatory provisions also safeguard this right. *See* 8 U.S.C. §§ 1229a(b)(4)(A), 1362; 8 C.F.R. §§ 292.5(b), 1240.10(a)(1). To assert a due process violation from the denial of this right to counsel, a noncitizen must show "that he was prevented from reasonably presenting his case." *Freza*, 49 F.4th at 298. The failure to comply with regulations protecting the right to counsel "will merit invalidation of the challenged agency action without regard to whether the alleged

---

[2] We have jurisdiction under 8 U.S.C. § 1252(a)(1). Because "the BIA affirm[ed] and partially reiterate[d] the IJ's discussions and determinations, we look to both decisions." *Myrie v. Att'y Gen.*, 855 F.3d 509, 515 (3d Cir. 2017). "We review legal determinations de novo and factual findings for substantial evidence." *Saban-Cach v. Att'y Gen.*, 58 F.4th 716, 724 n.23 (3d Cir. 2023). So "we exercise plenary review over . . . whether a petitioner's due process rights have been violated." *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 212–13 (3d Cir. 2017). We "review an IJ's decision to deny a continuance . . . for abuse of discretion," reversing only if the decision is "arbitrary, irrational or contrary to law" based on "the facts and circumstances of each case." *Hashmi v. Att'y Gen.*, 531 F.3d 256, 259–60 (3d Cir. 2008) (cleaned up).

[3] The dissent views Supreme Court dicta in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), as *sub silentio* overruling longstanding precedent that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (collecting cases). But, after *Thuraissigiam*, the Supreme Court has reiterated its longstanding precedent. *See, e.g.*, *Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993))); *A. A. R. P. v. Trump*, 605 U.S. 91, 94 (2025) (same). Moreover, in this matter, the United States government acknowledges that Robles had a right to due process in his removal proceedings; it argues only that the IJ afforded Robles the due process to which he was entitled.

violation has substantially prejudiced the complaining party." *Freza*, 49 F.4th at 299; *Leslie v. Att'y Gen.*, 611 F.3d 171, 180 (3d Cir. 2010) (holding that violation of a regulation concerning the right to counsel in removal proceedings "protects a fundamental statutory or constitutional right, such that we may order a new removal proceeding without a showing of prejudice"); *Aquino v. Att'y Gen.*, 53 F.4th 761, 766 (3d Cir. 2022) ("[A] violation of [the fundamental right to counsel] so undermines the structure of the hearing that we must automatically remand.").

Absent a noncitizen's express waiver, the "statutory and regulatory privilege of legal representation" requires an IJ to grant the noncitizen "a reasonable and realistic period of time to provide a fair opportunity for a respondent to seek, speak with, and retain counsel." *Matter of C-B-*, 25 I. & N. Dec. 888, 889 (BIA 2012). And when a right-to-counsel claim is "based solely on the IJ's decision to deny [a] continuance . . . , we treat the two claims as one and the same" and assess it according to the particular facts and circumstances of the case. *Freza*, 49 F.4th at 299 (cleaned up).

Under the facts and circumstances here, Robles has demonstrated a violation of his right to counsel. He was seeking counsel as an indigent person who does not speak English and who was detained in a remote location. *See Hernandez Lara v. Barr*, 962 F.3d 45, 47, 55–56 (1st Cir. 2020) (holding that a non-English-speaking detained noncitizen's right to counsel was violated when was provided fourteen business days to find counsel, and noting that even five weeks of notice would not have justified denying the last continuance request); *accord Usubakunov v. Garland*, 16 F.4th 1299, 1304–05 (9th Cir. 2021). Despite these challenges, the record reflects his ongoing efforts to retain

6

counsel, and it contains no indication that he was dilatory. Additionally, Robles was not informed that the merits of his case would be heard with or without counsel on January 12, and he never expressly waived his right to counsel. Given all this, we cannot conclude that continuing the hearing from December 1 through January 12—a period that included the winter holidays—provided Robles a reasonable and realistic period of time to secure counsel. *See Freza*, 49 F.4th at 299–301; *Chlomos v. U.S. Dep't of Just., Immigr. & Naturalization Serv.*, 516 F.2d 310, 314 (3d Cir. 1975) (vacating removal order where, "as a practical matter," two continuances were insufficient to obtain counsel and no dilatory tactics were evident).

The denial of an additional continuance before commencing the merits hearing prevented Robles from reasonably presenting his case—that is, presenting his case with a reasonable opportunity to do so assisted by counsel.[4] *Freza*, 49 F.4th at 298; *see also Leslie*, 611 F.3d at 181 ("The complexity of removal proceedings renders the [noncitizen's] right to counsel particularly vital to his ability to reasonably present his case." (cleaned up)). Because that denial of a continuance violated Robles's constitutional and statutory right to counsel, it was an abuse of discretion. *See Freza*, 49 F.4th at 302.

\* \* \*

For the foregoing reasons, we will grant the petition for review, vacate the BIA's order, and remand to the BIA with instructions to remand to the IJ for a new hearing.

---

[4] We also note that Robles' notice to appear for the hearing on January 12, 2024, referred only to a master hearing, not a merits hearing.

MATEY, *Circuit Judge*, dissenting.

The majority concludes Robles prevails on both of his due process challenges. But as an alien paroled into our Nation, the Fifth Amendment cannot ground Robles's claims. And even if Robles could invoke notions of due process, no violation occurred because Congress defined, and the Executive provided, the process thought due: an opportunity to retain counsel, not a guaranteed right to representation. So I respectfully dissent.

## I.

The Fifth Amendment requirement that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law" is a restriction on government action, "secur[ing] the individual from the arbitrary exercise of the powers of government." *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 244 (1819). The clause created no open-ended prerogative to oppose all public action, only a promise to follow procedures that, if established, explain how government can act against an individual's life, liberty, or property. So when assessing any challenge relying on the Fifth Amendment, we must determine 1) whether the Fifth Amendment extends to the person, property, or practice at issue and, if so, 2) what process is owed. Robles cannot invoke the Fifth Amendment as he has not made an entry into our Nation. But even if he had, Robles received all the process required by law.

**A.**

Arising from the compact of the people seeking municipal law[1] to protect their natural rights, the Constitution created "a government . . . ordained and established 'for the United States of America,' and not for countries outside [its] limits." *Ross v. McIntyre*, 140 U.S. 453, 464 (1891). Necessarily, its scope does not expand beyond the sovereignty claimed, and its guarantees "apply only to citizens and others within the United States." *Id.*; *see also Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[A]ll persons within the territory of the United States are entitled to the protection guarantied by [the Fifth and Sixth] [A]mendments."). Cases have concluded that once an alien "passe[s] through our gates, even illegally," he "may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).

Entry into the country is crucial, carving the constitutional line at which the Fifth Amendment first applies.[2] Without an entry, "the decisions of executive or administrative officers, acting within powers expressly conferred by [C]ongress, are due process of

---

[1] 1 William Blackstone, Commentaries *44.

[2] *See Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country, he becomes invested with the rights guaranteed by the Constitution to all people within our borders."); *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953))).

2

law." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892). Put differently, the process necessary to act on an alien's life, liberty, or property who has not made an entry is no more or less than what Congress elects to authorize. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950).

Robles did not "enter" the United States because merely "set[ting] foot on U. S. soil" is insufficient. *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020). The Supreme Court has outlined this principle over several decades, explaining that for constitutional limitations on federal action to attach, an alien's "roots [must] become . . . deeply fixed in this land," *Bridges v. Wixon*, 326 U.S. 135, 154 (1945), demanding not only arrival "within the territory of the United States," but the forging of "substantial connections with this country," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990).[3] It is a principle grounded in tradition, the long-accepted rule that a sovereign's laws and the privilege of the sovereign's protections extend only to "persons and things within its own territory according to its own sovereign will and public policy." Joseph Story, Commentaries on the Conflict of Laws, Foreign and Domestic § 22 (Boston, Hilliard,

---

[3] *See also Lau Ow Bew v. United States*, 144 U.S. 47, 61–62 (1892) ("By general international law, foreigners who have become domiciled in a country other than their own acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country."); *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (explaining that an individual at Ellis Island who had not "begun to reside permanently in the United States" "had gained no foothold in the United States"); *cf. Castro v. DHS*, 835 F.3d 422, 444–48 (3d Cir. 2016) (concluding that petitioners who unlawfully entered the country and were apprehended within hours were treated as aliens seeking admission at the border and thus could not invoke constitutional protections).

Gray, and Co. 1834). So because protection and allegiance are reciprocal,[4] an alien's access to process exists "only by virtue of his allegiance," which is manifested by his connections to our Nation. Philip Hamburger, *Beyond Protection*, 109 Colum. L. Rev. 1823, 1838 (2009). Constitutional constraints on governmental actions are not triggered simply by "an alien's position relative to [the] rigid conception [of] a line on a map." *Castro v. DHS*, 835 F.3d 422, 448 (3d Cir. 2016).[5]

Robles holds no deep ties to the United States. He arrived using the CBP One mobile application[6] on April 10, 2023, presented himself to immigration officials at the

---

[4] *See Qatanani v. Att'y Gen.*, 144 F.4th 485, 517–20 (3d Cir. 2025) (Matey, J., dissenting).

[5] Caselaw often passes over these principles with broad brushstrokes unnecessary to the decision. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."); *Trump v. J. G. G.*, 145 S. Ct. 1003, 1006 (2025) (per curiam) (same); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Mezei*, 345 U.S. at 212 ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (noting the Fifth Amendment extends to the "millions of aliens within the jurisdiction of the United States" regardless of whether their "presence in this country is unlawful, involuntary, or transitory"). But these decisions do not disturb the requirement of entry, allowing aliens "constitutional protections" only "when they have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (explaining that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly").

[6] The CBP One mobile application was launched in October 2020 with the primary purpose of allowing customs brokers "to make appointments for the inspection of perishable cargo." U.S. Dep't of Homeland Sec., Privacy Impact Assessment Update: CBP One™, DHS/CBP/PIA-068 at 2 (February 19, 2021), https://perma.cc/QT5M-JV7A. But former President Biden "later expanded CBP One so that migrants without

port of entry in Brownsville, Texas, and was then paroled into our Nation. By September, he was arrested in New Jersey for aggravated assault and possession of a weapon. Meaning his few months in our Nation were spent in opposition to our law, showing defiance to the Nation's tradition, and confirming he remains outside our political community. And, in any event, Robles never entered the United States, because parole is insufficient. "[A]liens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Thuraissigiam*, 591 U.S. at 139 (quoting *Mezei*, 345 U.S. at 215). That is because although "in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land . . . within the territorial limits of this

---

entry documents could schedule appointments at designated ports of entry on the southern border," and the mobile application quickly became "the primary method by which asylum seekers could enter the United States." American Immigration Council, *CBP One: An Overview*, at 1 (Mar. 24, 2025), https://perma.cc/LX3J-CMXF. Critics noted that the application had essentially become a "concierge service" for migrants and was "a full-on institutionalization of an open border and [an] abuse of our asylum laws," leading to "drugs flooding our schools" and "national security risks." Letter from Sen. Josh Hawley to the Hon. Alejandro Mayorkas at 1–2 (Mar. 30, 2023), https://perma.cc/F5UK-RJMV; *see also* Kristen Ziccarelli, Am. First Pol. Inst., *How Our Open Border Leaves Us More Vulnerable to Terrorism*, at 3 (Oct. 25, 2023), https://perma.cc/L6H3-4B83 ("CBP has released over 95% of all inadmissible aliens (266,846) who used the CBP One App to enter our country, including individuals from countries of concern."). For instance, in June 2024, U.S. Immigrations and Customs Enforcement arrested eight Tajikistan nationals with ties to ISIS, "and one of those men used the . . . CBP One app" to enter the country. Letter from Reps. Jim Jordan & Tom McClintock to the Hon. Alejandro Mayorkas at 1 (June 21, 2024), https://perma.cc/9TU2-K3NU. In early 2025, President Trump discontinued CBP One and replaced it with a new application, CBP Home, which offered a "self-deportation reporting feature . . . giv[ing] aliens the option to . . . self-deport, so they may still have the opportunity to return legally in the future and live the American dream." Press Release, DHS Launches CBP Home App with Self-Deport Reporting Feature (Mar. 10, 2025), https://perma.cc/T7CP-P3H4.

nation," the alien has not "accomplish[ed] an 'entry' by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission." *United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954); *see also Doe v. Att'y Gen.*, 659 F.3d 266, 269 (3d Cir. 2011) (explaining that parole is not synonymous with admission).[7]

Parole is a practical principle, "simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958). One that mirrors detention at the border because if an alien's "movements are restrained by authority of the United States," he is not considered to have made an "entry into the United States" regardless of "whether he enjoys temporary refuge on land . . . or remains continuously aboard ship." *Mezei*, 345 U.S. at 213. So although an alien may be "physically within our boundaries" after detention, he "is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate." *United States v. Ju Toy*, 198 U.S. 253, 263 (1905). Parole does not disturb that distinction, as "[i]t was never intended

---

[7] The Immigration and Nationality Act likewise provides that any "alien who is paroled . . . shall not be considered to have been admitted." 8 U.S.C. § 1101(a)(13)(B); *see also id.* § 1101(a)(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."). Only aliens who have been "admitted" can be "lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws." *Id.* § 1101(a)(20). So paroled aliens categorically lack the "great measure of security" that accompanies the "status" of being "admitted" to the country. *See Qatanani*, 144 F.4th at 498 (Matey, J., dissenting).

6

to affect an alien's status" or to indicate an alien was "legally 'within the United States.'" *Leng May Ma*, 357 U.S. at 190.

All told, Robles did not make an entry into the United States merely by presenting himself at the border and enjoying, or rather misusing, the privilege voluntarily afforded by the United States pending consideration of his asylum application.[8]

---

[8] As Robles's arguments do not meet the standards established for aliens raising procedural claims, I need not address decisions applying the Fifth Amendment to all aliens within our borders, even those who enter illegally. The Supreme Court first mentioned the Fifth Amendment's application to aliens in 1896, explaining its protection is not limited to citizens, but applies to "all persons within the territory of the United States." *Wong Wing v. United States*, 163 U.S. 228, 238 (1896). But that decision did not consider earlier evidence suggesting "that the Sovereign does not owe all aliens within its borders the same obligation it does its citizens." *Qatanani*, 144 F.4th at 520 (Matey, J., dissenting). And only a few years later, the Court specifically reserved the "question [of] whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for too brief of a period to have become, in any real sense, a part of our population, before his right to remain is disputed." *Yamataya v. Fisher*, 189 U.S. 86, 100 (1903). Instead, the Court held, only after an alien "has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population" must he receive "opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends." *Id.* at 101.

Since then, assumptions around what process is due aliens under the Fifth Amendment have spread, *see, e.g.*, *Mathews*, 426 U.S. at 77, but missing is rich, historically grounded reasoning for why the protections of the Fifth Amendment do not vary based on the type of admission into the country. Some point to the word "person" in the Fifth Amendment. *See, e.g.*, *Wong Wing*, 163 U.S. at 238. But at least some Federalists did not understand aliens to be covered by the restrictions on government action imposed by the Constitution. *See* 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 534 (Jonathan Elliot ed., Philadelphia, J.B. Lippincott Co. 2d ed. 1836). And eighteenth-century thinkers recognized the principle "founded in reason and the nature of government," that "[a]llegiance is the tie, or *ligamen*, which binds the subject to the king, in return for that protection which the king affords the subject." 1 Blackstone, Commentaries *366. As I have explained, an alien "falls into an 'obvious division,'" owing "only a '[l]ocal allegiance' to the Sovereign," "a temporary affinity 'for so long time as he continues within the king's

## II.

But even assuming Robles enjoys some protections under the Fifth Amendment, he received all the process specified by Congress and afforded by the Executive.

## A.

Congress allows aliens in removal proceedings "the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings." 8 U.S.C. § 1229a(b)(4)(A); *see also id.* § 1362 ("In any removal proceedings before an immigration judge . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."). But Congress warned that privilege may not "be construed to prevent the Attorney General from proceeding against an alien pursuant to section 1229a . . . if the time period [to obtain counsel] has elapsed and the alien has failed to secure counsel." *Id.* § 1229(b)(3). Meaning Congress allows aliens the opportunity to obtain counsel, not the right to halt proceedings until they do so. A rational result, because otherwise the immigration laws could be used to further what "is ultimately an interest in evading the law." *See Noem v. Vasquez Perdomo*, 606 U.S. ----, 2025 WL 2585637, at *4 (2025) (Kavanaugh, J., concurring in the grant of a denial of stay).

---

dominion and protection . . . and it ceases the instant such stranger transfers himself from this kingdom to another.'" *Qatanani*, 144 F.4th at 518 (Matey, J., dissenting) (quoting 1 Blackstone, Commentaries *366, 370). So how can an alien show allegiance to the Sovereign if he enters its territory in violation of the Sovereign's laws? Since these questions reserved by *Yamataya* have gone unaddressed for more than a century, litigants and scholars should pursue the question with renewed vigor.

8

Robles could have obtained counsel. Over nine months, he was notified at least five times of his ability to retain an attorney and provided with a list of qualified, low-cost specialists. For roughly five months of that period, Robles was not detained. And even once arrested for aggravated assault, Robles had another four months to find counsel, including the extra six weeks the IJ granted during two continuances. This ample amount of time to find representation is more than a "reasonable and realistic" opportunity. *In re C-B-*, 25 I. & N. Dec. 888, 889 (B.I.A. 2012). Denying Robles's request for a third continuance cannot be wrong.

Case law does not demand a different conclusion. In *Freza v. Attorney General*, the IJ "render[ed] Freza's right to counsel meaningless," 49 F.4th 293, 301 (3d Cir. 2020), by denying counsel's request for a continuance to prepare after having "only met with Freza for the first time less than 24 hours before the merits hearing and" with no "time to review the record," *id.* at 299.[9] Here, of course, Robles never found an attorney despite dozens of weeks, multiple notices, and two continuances. And in *Hernandez Lara v. Barr*, the First Circuit considered fourteen business days for a petitioner to retain counsel insufficient. 962 F.3d 45, 55–56 (1st Cir. 2020). More than enough time in my view—but regardless, Robles had far longer.

Robles responds that his detention after his arrest for assault, along with language barriers and the "holiday season," all left him without a reasonable and realistic time to

---

[9] In any event, *Freza* does not apply to aliens who failed to make an "entry" into the United States such as Robles, since the *Freza* petitioner was lawfully admitted and, indeed, "adjusted status to lawful permanent resident" prior to his removal proceedings. 49 F.4th at 295–96.

obtain counsel. That does not account for the endless weeks preceding his arrest, but even focusing on the six additional weeks the IJ granted him, Robles took the opportunity to place multiple calls to different attorneys. Those efforts apparently proved unsuccessful, but that does not mandate the "wheel-spinning" produced by "an infinite number of adjournments." *Hidalgo-Disla v. INS*, 52 F.3d 444, 447 (2d Cir. 1995). Indeed, "[i]f an immigration judge could not proceed with a hearing, after two adjournments, without the alien's express waiver, an alien seeking to stave off deportation would be able to win an infinite number of adjournments, and would be better off appearing *without* a lawyer than with one." *Id*.

That is why "mere 'inability to obtain counsel' [is] not a violation of due process, or a denial of [Robles's] right to counsel."[10] *See Ponce-Leiva v. Ashcroft*, 331 F.3d 369,

---

[10] As I have noted in other contexts, the statutory "privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceeding," 8 U.S.C. § 1229a(b)(4)(A), should not be confused with any right to counsel discussed in the Sixth Amendment. *Pino-Porras v. Att'y Gen.*, No. 22-3419, 2025 WL 1752491, at *5 n.10 (3d Cir. June 25, 2025) (Matey, J., dissenting). After all, it is "well-settled" that "'there is no Sixth Amendment right to counsel'" in immigration proceedings. *Ponce-Leiva v. Ashcroft*, 331 F.3d 369, 374 (3d Cir. 2003) (quoting *Uspango v. Ashcroft*, 289 F.3d 226, 231 (3d Cir. 2002)). That is because "[d]eportation is not a criminal proceeding and has never been held to be punishment." *Carlson v. Landon*, 342 U.S. 524, 537 (1952). It is "a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). For "[w]hile the consequences of deportation may assuredly be grave, they are imposed not as a punishment" but "to bring to an end *an ongoing violation* of United States law." *Reno v. American-Arab Anti-Discrimination Comm'n*, 525 U.S. 471, 491 (1999).

Reflecting that distinction, this Court described an alien's ability to hire counsel for removal proceedings as a "privilege" that was "statutorily conferred," not a right guaranteed by the Constitution. *Chlomos v. INS*, 516 F.2d 310, 311, 313–14 (3d Cir.

10

376 (3d Cir. 2003). So Robles cannot prevail on his first claim because he cannot show a violation of "fundamental statutory or constitutional rights," *Freza*, 49 F.4th at 299, that prevented him "from reasonably presenting his case" before the IJ, *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 208, 213 (3d Cir. 2017) (quoting *Fadiga v. Att'y Gen.*, 488 F.3d 142, 155 (3d Cir. 2007)).

**B.**

Finally, Robles's alternative claim fails because he was not eligible for any relief from removal. In exercising its constitutional authority to enforce our immigration laws, the Executive binds itself to the obligation that an IJ must "inform the alien of his or her

---

1975). But decades ago, we confused that clarity by presuming, without explanation, that aliens in civil immigration enforcement proceedings enjoy a freestanding *due process* right to counsel. *See, e.g.*, *Ponce-Leiva*, 331 F.3d at 374–75; *Borges v. Gonzales*, 402 F.3d 398, 408 (3d Cir. 2005). I can find no justification for that assumption, particularly in the light of decisions declining to identify a due process right to citizen civil litigants. *See Pennsylvania v. Finley*, 481 U.S. 551, 556 (1987) (rejecting a claimed due process right to counsel in a state postconviction proceeding since "access to a lawyer is the result of the State's decision, not the command of the United States Constitution" because the proceeding "is in fact considered to be civil in nature"). It is hard to see why a non-citizen is due more process through guaranteed legal assistance than a citizen facing a deprivation of property or privilege. Indeed, I assume that is why Congress has carefully created only a privilege to retain an attorney for some immigration proceedings. More problematic is the impact on our default rule that an error must be harmful before we will disturb the Executive's immigration decisions. *Yuan v. Att'y Gen.*, 642 F.3d 420, 427 (3d Cir. 2011) ("[W]e will view an error as harmless and not necessitating a remand to the BIA when it is highly probable that the error did not affect the outcome of the case."); *see also Suchite-Salguero v. Att'y Gen.*, 147 F.4th 355, 360–61 (3d Cir. 2025). By ordering a new removal proceeding without a showing of prejudice, we have imported Sixth Amendment concerns into our Fifth Amendment creation and effectively extended the structural-error review reserved for criminal prosecutions. Maj. Op. 5. That "inexplicably" regards an alien's privilege to hire "counsel at no expense to the government as if it were equivalent to a criminal defendant's absolute Sixth Amendment right to counsel." *Hernandez v. Holder*, 545 F. App'x 710, 712 (9th Cir. 2013) (Ikuta, J., concurring).

11

apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing." 8 C.F.R. § 1240.11(a)(2). But to trigger that obligation, the alien's eligibility for such relief must be *apparent*. Robles argues he was apparently eligible to apply for asylum and voluntary departure, but that is incorrect.

For Robles to receive asylum, he must show that "he was persecuted, or had a well-founded fear of persecution, 'on account' of a statutorily protected ground, including 'race, religion, nationality, membership in a particular social group, or political opinion.'" *Cortez-Amador v. Att'y Gen.*, 66 F.4th 429, 434 (3d Cir. 2023) (quoting 8 U.S.C. § 1101(a)(42)(A)). But Robles never claimed membership in a protected social group, nor did he offer any theory for why his claimed kidnapping qualified as "persecution." Rather, he candidly testified that his assailants were "people who [he] didn't know," A.R. 109, and when asked whether he knew why he was targeted he responded "[n]o, to be honest no," A.R. 110. And while Robles mentioned his Christian faith, his asylum application lacked any allegation that his religion was a "central reason" for his kidnapping and beating. *Gonzalez-Posadas v. Att'y Gen.*, 781 F.3d 677, 685 (3d Cir. 2015). So the record lacks any facts demonstrating apparent eligibility for asylum.

Nor was Robles apparently eligible for voluntary departure, which "may" be granted to an alien "physically present in the United States for a period of at least one year immediately preceding the date the notice to appear was served." 8 U.S.C. § 1229c(b)(1)(A). And even if he was, "there is no constitutional right to be

12

informed of possible eligibility for discretionary relief." *Bonhometre v. Gonzales*, 414 F.3d 442, 448 n.9 (3d Cir. 2005).

* * *

The Fifth Amendment does not apply to the actions Robles seeks to challenge. But even if it did, there has been no violation of the procedural protections Congress and the Executive extended. For those reasons, I respectfully dissent.